430 F.2d 355
 SUPERINTENDENT OF INSURANCE OF the STATE OF NEW YORK, as Liquidator of Manhattan Casualty Company, Plaintiff-Appellant,
v.
BANKERS LIFE AND CASUALTY COMPANY, Irving Trust Company, Belgian American Banking Corporation, Belgian American Bank & Trust Company, Garvin, Bantel & Company, George K. Garvin, Defendants-Appellees.
 No. 631.
 Docket 33869.
 United States Court of Appeals, Second Circuit.
 Argued March 26, 1970.
 Decided July 22, 1970.
 
 1
 Arnold Bauman, New York City (Eric Kaufman, David Wallenstein, New York City, on the brief), for plaintiff-appellant.
 
 
 2
 Irving Parker, of Jacobs, Persinger & Parker, New York City, for Bankers Life & Cas. Co. (Isaac M. Bayda, New York City, of counsel).
 
 
 3
 Winthrop, Stimson, Putnam & Roberts, New York City, for Irving Trust Co. William W. Karatz, New York City (John B. Daniels, William C. F. Kurz, New York City, of counsel).
 
 
 4
 Sullivan & Cromwell, New York City, for Belgian-American Banking Corp. and Belgian-American Bank & Trust Co. William E. Willis, New York City (Michael M. Maney, New York City, of counsel).
 
 
 5
 Robert M. Haft, Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for George K. Garvin.
 
 
 6
 Basch & Seits, New York City, for Garvin, Bantel & Co. Kevin Seits, New York City (Sheldon Basch, New York City, of counsel).
 
 
 7
 Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and BLUMENFELD, District Judge.*
 
 BLUMENFELD, District Judge:
 
 8
 Appellant Superintendent of Insurance of the State of New York, as Liquidator of Manhattan Casualty Company (Manhattan), commenced this action in 1963 alleging violations by ten defendants of § 17(a) of the Securities Act of 1933. On September 10, 1968, defendants Bankers Life and Casualty Company (Bankers Life), Belgian American Bank & Trust Company (Belgian Trust), and Belgian American Banking Corporation (Belgian Banking) moved to dismiss the action before the late Judge Herlands. On October 1, 1968, defendants Irving Trust Company (Irving), Garvin, Bantel & Company (Garvin, Bantel), and George K. Garvin made similar motions before Judge Ryan. On June 4, 1969, Judge Herlands entered judgment dismissing the action as to Bankers Life, Belgian Trust, and Belgian Banking. His thorough and considered decision granting the motions of these defendants is set out at 300 F.Supp. 1083 (S.D.N.Y.1969). Shortly thereafter, on June 17, 1969, Judge Ryan, concurring in the reasoning of Judge Herlands' opinion, entered judgment dismissing the action as to Irving, Garvin, Bantel, and George K. Garvin. It is from these judgments that the Superintendent appeals. We affirm.
 
 I. Facts
 
 9
 Manhattan was a casualty insurance company wholly owned by defendant Bankers Life and operated by it as a subsidiary. In January 1962 two individuals, defendants Standish T. Bourne and James F. Begole, both now deceased, and not involved in this appeal, agreed to purchase all the stock of Manhattan. On January 19, 1962, a contract was executed between Begole as purchaser and Bankers Life as seller, providing for the sale of the Manhattan stock for $5,000,000 on January 24, 1962. On that day, Begole, John F. Sweeny[1] and C. Joseph Gunter, an officer of Irving, went to Manhattan's office for the closing. Pursuant to plans made in advance of the closing, Gunter tendered an Irving check for $5,000,000 to an officer of Bankers Life and, in exchange, all of the shares of Manhattan stock were given to Begole.
 
 
 10
 This transaction between Bankers Life and Begole still remains unchallenged because neither the former, as seller, nor the latter, as buyer, has brought any action seeking damages or any relief, one against the other. In this lawsuit our attention has been shifted away from that conventional purchase and sale of the Manhattan stock to the legerdemain employed by the buyer to obtain the $5,000,000 with which to pay for the stock.[2]
 
 
 11
 Following the closing, but on the same day, United States Government securities (Treasury bonds) from Manhattan's portfolio were sold[3] and the proceeds, amounting to $4,854,552.67, plus enough cash to bring the total to $5,000,000, were credited to an account in the name of Manhattan at Irving, and the $5,000,000 Irving check was then charged against this account. As a result of this first series of transactions, Bankers Life had received $5,000,000 in exchange for the Manhattan stock, Begole and Bourne owned the stock, and Manhattan's assets, having been used to purchase the Manhattan stock, had consequently been reduced by $5,000,000.
 
 
 12
 In order to conceal the depletion of Manhattan's assets,[4] the individuals now in control of Manhattan had a neatly prepared ruse ready at hand. At Garvin's request, Irving issued a second check for $5,000,000 payable to Belgian Trust. Sweeny, president of Manhattan, used this check to buy a $5,000,000 six-months' certificate of deposit from Belgian Trust payable to Manhattan. That certificate was then endorsed by Sweeny as president of Manhattan to New England Note Corporation (New England) and delivered to Bourne, president of New England. Bourne then endorsed and delivered it to Belgian Banking as collateral for a six-months' $5,000,000 loan from Belgian Banking to New England. The proceeds of this loan were then delivered to Irving to cover its $5,000,000 check drawn to the order of Belgian Trust.
 
 
 13
 To recapitulate, there were two sets of telescoped transactions — all completed on the same day:
 
 
 14
 A. All of Manhattan's shares were purchased from Bankers Life for $5,000,000, borrowed from Irving. After thus gaining control of Manhattan, the purchaser sold government bonds out of Manhattan's portfolio and used the proceeds to pay off the loan from Irving.
 
 
 15
 B. To conceal the above depletion of Manhattan's assets, the new owners of Manhattan and those they put in control arranged for a second loan from Irving for $5,000,000. With this they bought a $5,000,000 certificate of deposit from Belgian Trust in the name of Manhattan, and assigned that to New England (Bourne). New England endorsed it to Belgian Banking as security for a $5,000,000 loan to New England. The proceeds were then used to repay Irving's second loan. However, Manhattan's books reflected only the sale of its government bonds and the purchase of the certificate of deposit. Manhattan's records did not show (1) that the proceeds of the sale of these bonds were used by Begole to pay for his purchase of Manhattan's shares or (2) that the certificate of deposit had been assigned to New England and by it pledged to Belgian Banking.
 
 
 16
 The loans and certificates outlined in B. were twice renewed. The first renewal was in July 1962. In January 1963, when Belgian Banking refused to renew its loan to New England a similar round robin set of transactions was effected by substituting Marine Midland Trust Company to perform Belgian Banking's role. In April 1963 the New York Insurance Department discovered the inadequacy in Manhattan's assets and placed the company in liquidation.
 
 II. Appellant's Claims
 
 17
 The complaint alleges that the foregoing related transactions constituted one or more violations of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a).[5] The district court properly considered as well the applicability to the pleaded facts of § 10(b) of the 1934 Act, 15 U.S.C. § 78j (b)[6] and of S.E.C. Rule 10b-5[7] promulgated thereunder. See Hoover v. Allen, 241 F.Supp. 213, 226 n. 7 (S.D.N.Y.1965). On appeal, appellant claims the pleaded facts, as well as those otherwise contained in the record, establish his right to recover under one or both of these sections for fraud perpetrated (1) in connection with the purchase and sale of the Manhattan stock, (2) in connection with the sale of Treasury bonds from Manhattan's portfolio, and (3) in connection with transactions involving certificates of deposit and occurring after January 24, 1962. We disagree and affirm the decision of the district court.
 
 III. Sale of Manhattan Stock
 
 18
 Section 17(a) of the 1933 Act provides a cause of action only for a defrauded purchaser. Schoenbaum v. Firstbrook, 268 F.Supp. 385, 396 (S.D. N.Y.1967), aff'd, 405 F.2d 200 (2d Cir.), rev'd in part on other grounds, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied sub nom. Manley v. Schoenbaum, 395 U. S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Section 10(b) of the 1934 Act and Rule 10b-5 extend a similar right to a defrauded seller as well as to a purchaser of securities. Greenstein v. Paul, 400 F.2d 580, 581 (2d Cir. 1968); Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); see Christophides v. Porco, 289 F.Supp. 403, 406 (S.D.N.Y.1968).[8] Bankers Life was the seller of the Manhattan stock; Begole the purchaser. There is no theory under which Manhattan, in whose shoes this appellant stands, may be regarded as either the purchaser or the seller of Bankers Life's Manhattan stock. Consequently the appellant does not fall within the classes of those for whom a cause of action is created either by § 17(a) of the 1933 Act or § 10(b) of the 1934 Act for damages incurred as a result of that transaction.
 
 IV. Sale of Manhattan's Treasury Bonds
 
 19
 Another thrust of this appeal is that the district court erred in holding that no federal cause of action was stated with respect to the purchase or sale of Treasury bonds from Manhattan's portfolio. Appellant's claim that Manhattan is entitled to federal relief as the defrauded seller of those bonds was presented to the district court only as "amendatory allegations presented in open court and not formally set forth in the complaint." 300 F.Supp. at 1098. Moreover, the alleged facts presented in support of the claim on appeal do not appear anywhere in the complaint. See note 3, supra. Assuming that they are properly before us, and also that they are true, Kossick v. United Fruit Co., 365 U.S. 731, 732, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), we hold that appellant has not made out a claim cognizable under the federal Securities Acts.
 
 
 20
 Briefly stated, appellant's claim is that a majority of the board of directors of Manhattan was deceived by misrepresentations of other members of the board and some of the defendants that the sale of the bonds was intended only to effectuate a substitution of those assets for a certificate of deposit equal in value; that in fact the certificate of deposit so substituted was collateralized to its full face value in favor of an unrelated corporate entity; and that on the basis of the fraudulent representations, the board was deceitfully induced to authorize the sale of the bonds in exchange for a certificate without value to the corporation.
 
 
 21
 What distinguishes the fraud perpetrated on Manhattan in this case from one cognizable under Rule 10b-5 is that its sole object was to obtain possession of Manhattan's government bonds for the personal use of the perpetrators. No doubt the deception was successful, for had the board known that Sweeny and his associates intended to misappropriate the proceeds for their own use it undoubtedly would not have authorized their sale. But that deception did not infect the subsequent sales transaction. With respect to the terms of the sale itself neither the purchaser nor the seller of the bonds was deceived or defrauded. Cf. Ruckle v. Roto Am. Corp., 339 F.2d 24 (2d Cir. 1964); Globus, Inc. v. Jaroff, 266 F. Supp. 524 (S.D.N.Y.1967); Simon v. New Haven Board & Carton Co., 250 F. Supp. 297 (D.Conn.1966). Indeed, it is no part of the liquidator's claim that the full and fair market price was not paid for those bonds by their purchaser. The fraud which harmed the plaintiff consisted of the failure of Sweeny and his associates to account for the proceeds. There is a structural difference between the sale of the corporation's bonds at a concededly fair price and the subsequent fraudulent misappropriation of the proceeds received.
 
 
 22
 Rule 10b-5 was not intended to provide a remedy for schemes amounting to no more than "fraudulent mismanagement of corporate affairs." Birnbaum v. Newport Steel Corp., supra, 193 F.2d at 464. The scope of the rule must be assessed in light of the purposes of the legislation from which it derives, which we recently found to be "to promote free and open public securities markets and to protect the investing public from suffering inequities in trading * * *." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 858 (2d Cir. 1968) (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In that case, we construed the "in connection with" requirement of Rule 10b-5 as follows:
 
 
 23
 "Therefore it seems clear from the legislative purpose Congress expressed in the Act, and the legislative history of Section 10(b) that Congress when it used the phrase `in connection with the purchase or sale of any security' intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." Id. 401 F.2d at 860.
 
 
 24
 See Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969).
 
 
 25
 The fraud alleged in this case in no way affected either the securities markets or the investing public. No stockholders were defrauded, no investor injured. The purity of the security transaction and the purity of the trading process were unsullied. There was no danger that the securities sold would be over-valued on reaching the public markets. Cf. Ruckle v. Roto Am. Corp., supra, 339 F.2d at 28.
 
 
 26
 Despite the power of the Commission to promulgate rules "appropriate in the public interest or for the protection of investors," § 78j(b), the scope of the rule in fact promulgated is expressly limited to protection against fraud or deceit "in connection with the purchase or sale of any security." Rule 10b-5. Although in the broadest sense the public interest is involved when a corporation which is subject to regulation by the state Superintendent of Insurance is defrauded, the public interest cognizable by § 10(b) is limited to preserving the integrity of the securities markets. The civil liabilities provisions of the federal Securities Acts, beginning in 15 U.S.C. § 77l were "part of a broad integrated program designed to obtain honest dealings in securities," Wilko v. Swan, 127 F.Supp. 55, 58 (S.D.N.Y.1955), not one to create an unlimited federal right of action for damages for all who have been defrauded in any area of economic activity. The condition imposed by Rule 10b-5 that the fraud be in connection with the purchase or sale of a security is wholly consistent with that program. Thus, we do not decide that the creditors of Manhattan do not have any remedy under general state tort law for the fraud practiced on their debtor, but only that the federal Securities Acts have not provided a federal forum for its enforcement.
 
 V. Transactions Involving Certificates of Deposit
 
 27
 Appellant also contends that Manhattan was defrauded in connection with both purchases and sales of various six-month certificates of deposit exchanged after January 24, 1962. These transactions, which were integral parts of the scheme[9] to conceal the prior depletion of Manhattan's assets, are sufficiently described in the opinion below and need not be fully restated here. The conclusion we have reached that the sale of Manhattan's Treasury bonds did not present a federal cause of action applies equally to these transactions. The certificates of deposit or their proceeds may have been fraudulently misapplied, but there was no fraud in connection with their purchase or sale. In each instance they were bought and sold for their full face amount.
 
 
 28
 Since we have considered those facts appellant would include in an amendment of his complaint in reaching our conclusion that a claim for relief under the federal Securities Acts is not alleged, we also affirm the district court's denial of the motion to amend.
 
 
 29
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Of the District of Connecticut, sitting by designation
 
 
 [1]
 At oral argument in the district court, it was learned that Manhattan ousted Sweeny from the presidency of Manhattan at about the time that Bankers Life decided to sell the Manhattan stock, and that subsequent to the ouster Sweeny established contact between Begole and Bourne and Bankers Life. Judge Herlands concluded:
 "Probably at that time, Sweeny also arranged with Begole and Bourne that he should be reinstated as president of Manhattan when, and if, Begole and Bourne acquired control of Manhattan." 300 F.Supp. at 1087 and n. 4.
 
 
 [2]
 The details of financing the purchase of Manhattan stock were apparently the responsibility of Bourne. He engaged the services of defendant George K. Garvin and the latter's firm of money brokers (Garvin, Bantel), who had arranged in advance for the above transaction as well as those to follow
 
 
 [3]
 The complaint is silent as to the source of authority for this sale of securities from Manhattan's portfolio. Noting that fact, Judge Herlands stated:
 "Conceivably it was [Sweeny, apparently installed as president of Manhattan after the stock changed hands] who directed the Chemical Bank to deliver Manhattan's portfolio of * * * securities to Irving Trust, authorized the sale of these securities, and then transferred Manhattan cash to Irving Trust in order to cover completely the $5,000,000 Irving Trust check payable to Bankers Life." 300 F.Supp. at 1089.
 He also noted the possibility that a board of directors might have been named, which in turn met and appointed Sweeny as president and granted him authority to effect the transactions on Manhattan's behalf. Id. at 1089 n. 6.
 Appellant vigorously contends that this represents a serious misunderstanding of fact vital to his theory of recovery. His contention is that the sale of Treasury bonds was authorized by resolution of the board of directors on the basis of a representation that the sale of bonds and purchase of a certificate of deposit was merely a change in the company's investment portfolio. Although every minute detail of the pretenses used by Begole and his associates to mask their fraudulent activity may not have been adduced from the complaint or from the other parts of the record as augmented after some six years of discovery, we are satisfied that the able district judges overlooked nothing that would affect the character of the claim.
 
 
 [4]
 The financial ability of corporations engaged in the business of liability insurance to meet claims against its policy-holders is subject to regulation under the laws of New York. Their books are open to regular inspection by experts in that business employed by the insurance department of the State of New York
 
 
 [5]
 Section 17(a) provides:
 "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly —
 "(1) to employ any device, scheme, or artifice to defraud, or
 "(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."
 
 
 [6]
 Section 10(b) provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
 * * * * *
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
 
 
 [7]
 Rule 10b-5 provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 "(1) to employ any device, scheme, or artifice to defraud,
 "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 "in connection with the purchase or sale of any security."
 
 
 [8]
 Although there has been some judicial expansion of the category of persons who may be considered "purchasers," cf. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967), or "sellers" see Vine v. Beneficial Fin. Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); Hooper v. Mountain States Sec. Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), nothing in the cited cases undermines the now well-settled purchaser-seller rule of Birnbaum, especially in view of its recent reaffirmation in Greenstein. But see, Weitzen v. Kearns, 271 F.Supp. 616, 622 (S. D.N.Y.1967); Entel v. Allen, 270 F. Supp. 60, 69 (S.D.N.Y.1967)
 
 
 [9]
 Although the plaintiff contends that it is clear that liability would attach at any one of a number of junctures along the path that led to the liquidation of Manhattan, it expressly disclaims the right to separate recoveries for each of these "separate and distinct fraudulent schemes."
 
 
 HAYS, Circuit Judge (dissenting):
 
 30
 Plaintiff has succeeded to all the rights of Manhattan and is the proper person to assert those rights. See Hooper v. Mountain States Securities Corp., 282 F.2d 195, 206-207 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed. 2d 693 (1961), where plaintiff was the defrauded corporation's trustee in bankruptcy.
 
 
 31
 Manhattan was the victim of a "scheme * * * to defraud" (Rule 10b-5). Judge Blumenfeld has adequately described that scheme. Since the vital center of the scheme, the vehicle for the perpetration of the fraud, was the sale of Manhattan's stock, it seems to me to be completely unrealistic to say that the fraud was not committed "in connection with the purchase or sale of any security."
 
 
 32
 This court has repeatedly indicated its intention to give a broad and liberal interpretation to Rule 10b-5 in order to assure that that provision is used to accomplish the beneficent purposes for which the statutes governing sales of securities were enacted. See Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967); S. E. C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied sub nom. Coates v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454 (1969); Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); S. E. C. v. Great American Industries, Inc., 407 F.2d 453 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969). In our most recent expression on the subject, we said that "[t]he purchase-sale requirement must be interpreted so that the broad design [of the statutes] * * * is not frustrated by the use of novel or atypical methods" and we quoted from S. E. C. v. Texas Gulf Sulphur, supra, the following language inter alia: "the courts, as they should, have broadly construed the statutory phrase `in connection with the purchase or sale of any security.'" Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 798 & n. 14 (1969).
 
 
 33
 In my opinion, the purposes of the statutes would be best accomplished here by recognizing plaintiff's standing to enforce the duties created by those statutes.