**Harold DRACHMAN and Claire Drachman, Plaintiffs-Appellants,**

**v.**

**Lawrence A. HARVEY et al., Defendants-Appellees.**

**No. 338, Docket 35077.**

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1971.

Decided July 21, 1971.

On Rehearing in Banc Jan. 18, 1972.

Leibowitt, Milberg, Weiss & Fox, New York City (Melvyn I. Weiss and Lawrence Milberg, New York City, of counsel), for plaintiffs-appellants.

Cullen & Dykman, Brooklyn, N. Y. (Arnold & Porter, Washington, D. C., Thomas M. Lamberti, New York City, G. Duane Vieth and Richard J. Wertheimer, Washington, D. C., of counsel), for appellee Martin Marietta Corp.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Edward N. Sherry and Robert A. Meister, New York City, of counsel), for appellee Leo M. Harvey.

Simpson, Thacher & Bartlett, New York City (Peter J. Schlesinger, New York City, of counsel), for appellee C. Fitzhugh Gordon.

G. Bradford Cook, Gen. Counsel, S. E. C., Washington, D. C., (Walter P. North, Associate Gen. Counsel, Theodore Sonde, Asst. Gen. Counsel, and W. Bruce McConnel, Atty., S.E.C., of counsel), for Securities & Exchange Comm., amicus curiae.

Before LUMBARD, MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal from a judgment dismissing the complaint and the supplemental complaint (collectively referred to as "the complaint") in a shareholder's derivative action for alleged violations of

§ 10(b) of the Securities Exchange Act of 1934,[1] Rule 10b-5[2] promulgated thereunder, and of state corporate fiduciary law, the last of which claims are asserted under pendent jurisdiction. Judgment was entered without opinion by Judge Travia upon appellees' motion to dismiss under Fed.R.Civ.P. 12(b) (6) and 17(b).

This case presents three issues of not inconsiderable interest: (1) whether shareholders who held stock in "street name" at the time of the fraudulent transactions alleged in the complaint have standing to maintain a derivative action for violations of § 10(b) and Rule 10b-5, when state law (in this case California law) would require as a prerequisite to standing that derivative plaintiffs be "registered" or "record" owners at the time of the wrongs alleged; (2) whether a corporation's redemption of its convertible debentures is a "purchase" within the meaning of § 10(b) and Rule 10b-5, so as potentially to come within the sphere of securities transactions intended to be covered by the Exchange Act; and (3) whether the fraudulent transactions complained of, taken individually or collectively, are cognizable under § 10(b) and Rule 10b-5. We hold that appellants have standing; but we conclude that appellants have failed to state a claim for which relief can be granted under § 10(b) and that the judgment below must therefore be affirmed,[3] thus rendering it unnecessary for us to reach the question of whether the debenture redemption is a "purchase" within the meaning of the Exchange Act.

## I. FACTS

### The Major Parties

Plaintiffs-appellants, residents of New York, are shareholders of Harvey Alumi-num Incorporated (Harvey Aluminum) and were shareholders, though not "record owners," of 100 shares of Harvey Aluminum stock at the times of the fraudulent transactions complained of. Defendants-appellees include Harvey Aluminum, as a nominal defendant, Harvey Aluminum's seven directors (four of whom were also officers) and Martin Marietta Corporation (Martin Marietta). Harvey Aluminum is incorporated and based in California; Martin Marietta is incorporated in Maryland and its principal place of business is in New York. Both Harvey Aluminum and Martin Marietta are publicly owned corporations listed on the New York Stock Exchange. Defendants-appellees Lawrence A. Harvey and Homer M. Harvey (the Harveys), two of the leading actors in the transactions in issue, were individually substantial and collectively controlling, shareholders of Harvey Aluminum and enjoyed the corporate positions of President and Director and Executive Vice President and Director of Harvey Aluminum, respectively.

### The Plan

As this is an appeal from a judgment of dismissal upon the pleadings under Fed.R.Civ.P. 12(b) (6), we assume the following allegations of fact to be true.[4] During November 1968, Martin Marietta determined that it would be to its interest to acquire control of Harvey Aluminum. In furtherance of this objective, Martin Marietta conspired with the Harveys to gain and secure control for Martin Marietta. The first phase of the plan called for the purchase by Martin Marietta from the Harveys of approximately 2.7 million shares of Harvey Aluminum Class B common stock, which represented approximately 40% of the

1. 15 U.S.C. § 78j(b).

2. 17 C.F.R. § 240.10b-5 (1968).

3. In reviewing the sufficiency of the complaint on an appeal from the dismissal thereof, it clearly appears to us for the reasons to be developed in Section III, *infra*, that appellants can prove no set of facts in support of their claim which would entitle them to relief. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

4. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174–175, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Murray v. City of Milford, 380 F.2d 468, 470 (2d Cir. 1967); 2A Moore's Federal Practice ¶ 12.08, at 2266–2267 (2d ed. 1968).

outstanding voting stock, at a price of $40 per share. This price was some $11.20 per share over the then current market price and represented an aggregate premium of nearly $30 million. Phase One was completed in November 1968.

Phase Two called for continued use of the Harvey-Martin Marietta conspiracy: the Harveys remained in their positions as officers and directors of Harvey Aluminum "with the facade of acting solely in the interest of Harvey Aluminum and its shareholders when in fact they were acting under the domination and control of and in the interest of defendant Martin Marietta."[5] Specifically, the Harveys "recommended" to, and voted at, the May 23, 1969 Harvey Aluminum board of directors meeting that on June 27, 1969, Harvey Aluminum call its entire then outstanding issue of 5½% convertible subordinated debentures due July 1, 1999, at a cost of $6.6 million. The action was approved. The call price of $105 exceeded the June 27, 1969 market value of the convertible debentures, and the conversion ratio to common stock was unfavorable. By causing holders to redeem their debentures at cost, thereby eliminating the possibility of a 222,000 share dilution through conversion to Harvey Aluminum Class A common stock, Martin Marietta increased its percentage holdings and secured its desired control position without having to acquire shares of common stock in the marketplace. Upon the successful completion of Phase Two, Martin Marietta assumed formal operating control of Harvey Aluminum by causing its designee to be elected president of the corporation.

*Damage to Harvey Aluminum Alleged and Recovery Sought*

Appellants claim that as a result of the conspiracy Harvey Aluminum has suffered damage in the amount of $6.6 million, the amount caused by appellees to be paid to the holders of the entire issue of convertible debentures outstanding pursuant to Phase Two. The alleged harm to Harvey Aluminum by the debenture redemption was caused by appellees' "defrauding," or acceding in the "defrauding," of Harvey Aluminum out of the use of its $6.6 million working capital at a time when it was borrowing and contemplating borrowing additional funds in a critically tight capital market with record high interest rates.[6] Moreover, as a result of the improvident redemption for wrongful purposes, Harvey Aluminum also allegedly lost the foreseeable opportunity to gain additional equity capital, free and clear of all expenses involved in going to the capital market, from debentureholders who subsequently, but for the redemption, might have decided to convert into common stock.

Appellants also seek to recover on behalf of Harvey Aluminum from Martin Marietta and the individual appellees the nearly $30 million premium paid and received in connection with Phase One, apparently on the theory that the otherwise lawful sale of the 2.7 million shares of Harvey Aluminum Class B common stock was "infected" with an overriding fraudulent purpose and thereby was made "in connection with" the subsequent "fraudulent" redemption transaction contemplated in Phase Two.

## II. STANDING TO SUE

Appellants' capacity to sue derivatively on behalf of Harvey Aluminum is challenged on the ground that neither

---

5. Complaint at 8a; Appellants' Br. at 3.

6. During 1969, appellees admit that Harvey Aluminum was borrowing money at interest rates as high as 9% per annum, in striking contrast to its use of the $6.6 million at what was then an exceptionally low 5½% per annum. Appellees' Answers to Interrogatories at 19a–20a, 26a.

Fed.R.Civ.P. 23.1 [7] nor the Exchange Act confers standing on beneficial shareholders [8] and that therefore state law must apply. It is suggested that California General Corporation Law § 834, which permits derivative actions by plaintiffs only if they are "registered shareholder[s] * * * at the time of the transaction[s] or any part thereof" of which they complain, controls the disposition of this case [9] and requires dismissal at the threshold. The questions of who is a "shareholder" for purposes of a derivative action brought under the Exchange Act and by reference to what law (procedural or substantive, state or federal) the answer to the principal question is to be determined, do not appear to have been answered in precedent to be found in reported appellate court decisions. We agree with appellees that Fed.R.Civ.P. 23.1 leaves open the question of who is a "shareholder," [10] and

7. Rule 23.1 provides in pertinent part as follows :

"In a derivative action brought by one or more shareholders * * * of a corporation * * * the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder * * * at the time of the transactions of which he complains. * * * "

8. Appellants uncontestedly were beneficial or equitable owners of 100 shares of Harvey Aluminum stock, as opposed to registered or record owners thereof, at the time of the transactions complained of. After appellees served notice of their motion to dismiss appellants took their shares out of "street name" and caused them to be registered formally in their own names.

In their original complaint, appellants alleged that they "*own shares* of common stock of Harvey Aluminum Incorporated (Harvey Aluminum) and were such shareholders at the times of the transactions with which this complaint deals [emphasis supplied]." Complaint at 5a. In their supplemental complaint filed after service of appellees' notice of motion to dismiss, appellants alleged that they "*are registered owners* of common stock of [Harvey Aluminum] and *were shareholders* at the time of the transactions, etc. [emphasis supplied]." Supplemental Complaint at 34a.

9. It is urged that if state law applies, it is California rather than New York law which governs the question of the capacity to sue on behalf of Harvey Aluminum. Fed.R.Civ.P. 17(b) refers the court to the law of the state in which the district court is sitting, in this case New York. New York allows an equitable shareholder of a foreign corporation to bring a derivation action on behalf thereof only if the foreign corporation is "doing business" in New York. N.Y.Bus.Corp.L. §§ 1319(a)

(2), 626 (McKinney's Consol. Laws, c. 4, 1963). The complaint does not allege that Harvey Aluminum is doing business in New York. Under these circumstances New York law would defer to the law of the state of incorporation to determine capacity to sue, which in this case is Calif. Gen.Corp.L. § 834, which would bar this suit.

10. Appellants argue that Fed.R.Civ.P. 23.1, by itself, confers standing to sue and rely heavily on the authority of HFG Co. v. Pioneer Pub'g Co., 162 F.2d 536 (7th Cir. 1947) ; accord, Weinhaus v. Gale, 237 F.2d 197, 200 (7th Cir. 1956), a diversity case otherwise squarely in point. In *HFG*, the court held that former Rule 23(b) confers standing upon beneficial shareholders to sue in federal court even on claims arising under state law which are cognizable solely because of diversity of citizenship, and even though state law denies standing to equitable owners. After an extended discussion of then existing Fed.R.Civ.P. 23(b), predecessor of Rule 23.1, and Equity Rule 27, predecessor of Rule 23(b), the Seventh Circuit expressly rejected the contention that the federal rulemakers intended to limit standing to sue derivatively under Rule 23(b) to "record owners," as required by Illinois law and held that the question "who is a 'shareholder' " is to be determined solely by reference to federal procedural law. Sensitive to the requirement of 28 U.S.C. § 2072 that the Federal Rules cannot "abridge, enlarge or modify any substantive right," the court stated that in its view Rule 23(b) made "no change in the substantive right of a litigant," 162 F.2d at 539, and that a plaintiff's allegation of beneficial ownership merely comported with the "ordinary and accepted meaning" of the term "shareholder" and the meaning long ascribed to it prior to the adoption of the Federal Rules. *Id.* at 540.

that for state causes of action, standing is determined under state substantive law.[11] We believe, however, that Federal law must be consulted to decide whether there is standing to sue under the Exchange Act,[12] and that federal law confers standing upon beneficial shareholders such as the Drachmans.

Only two reported cases under the Exchange Act, both in the Southern District of New York, even raised the question under consideration. In the first, Treves v. Servel, Inc.,[13] the court held that "a shareholder need not be of record to maintain a derivative action" [14] brought under the Securities Act of 1933,[15] the Exchange Act and § 8 of the Clayton Act.[16] In support of its conclusion the court relied on the authorities

As Professor Moore has aptly commented, however:

> "The majority of the court in the *HFG* case * * * confused the question as to the procedural character of original Rule 23(b) with the question whether the right of an equitable owner is a matter of substantive law."

3B Moore's Federal Practice ¶ 23.1.17, at 23.1–154 n. 14 (2d ed. 1969); *see also id.* at 23.1–151.

11. *See* HFG Co. v. Pioneer Pub'g Co., 162 F.2d 536, 541 (7th Cir. 1947) (concurring opinion of Lindley, D. J.); *cf.* Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

*See also* Bankers Nat'l Corp. v. Barr, 7 F.R.D. 305, 307 (S.D.N.Y.1945), a diversity action for corporate waste by a shareholder of record as of the date of suit, but who like appellants was only a beneficial shareholder as of the time of the actions complained of. The court stated that while it was of the opinion that

> "Rule 23(b), in so far as it prescribes that the plaintiff must be a shareholder at the time of the transaction of which he complains, presents a rule of procedure, without reference to state law, the question of who is a 'shareholder' for purposes of suit within the meaning of that rule 'goes beyond a mere matter of procedure.' "

The court concluded that the answer to this question must be made by reference to applicable substantive law, relying upon and following the Third Circuit's leading case of Gallup v. Caldwell, 120 F.2d 90, 93 (3d Cir. 1941), *rev'g* 32 F.Supp. 711 (D.Del. 1940), another diversity case otherwise in point with the issue at bar, which distinguished between determining who is a "real party in interest," a purely procedural question under Fed.R.Civ.P. 17(b), and who may assert shareholders' rights on behalf of the corporation.

12. Appellees strongly urge us to follow Hausman v. Buckley, 299 F.2d 696, 701 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962). This was a shareholder's derivative action brought under diversity jurisdiction, in which the question was not "who is a 'shareholder,' " but whether a shareholder had standing to sue in a New York federal forum when the jurisdiction of incorporation (Venezuela) specifically forbade the bringing of shareholder suits. The *Hausman* panel properly recognized that the latter, and by extension the former, questions are matters of substantive rather than procedural law, involving choice-of-law principles.

*Hausman*, a diversity case, is not at all inconsistent with our decision today; it is merely inapposite. Compare Kane v. Central American Mining & Oil Co., 235 F.Supp. 559, 564 (S.D.N.Y. 1964) with Lowell Wiper Supply Co. v. Helen Shop, Inc., 235 F.Supp. 640, 642 (S.D.N.Y. 1964). We are not dealing here with a cause of action in which federal jurisdiction is necessarily dependent on diverse citizenship, but with a case arising under a broadly remedial federal statute which itself confers exclusive jurisdiction upon the federal courts. *Cf.* McClure v. Borne Chem. Co., 292 F.2d 824, 830, 833 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961) (issue of security-for-costs in an Exchange Act suit a matter of federal substantive law). The doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), followed in the diversity analogue of McClure, *supra*, Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), is therefore inapplicable. *See* McClure, *supra*, 292 F.2d at 830; Fielding v. Allen, 181 F.2d 163, 168 (2d Cir.), cert. denied Ogden Corp. v. Fielding, 340 U.S. 817, 71 S.Ct. 46, 95 L.Ed. 600 (1950) (issue of security-for-costs in an action under the Interstate Commerce Act a matter of federal substantive law).

13. 244 F.Supp. 773 (S.D.N.Y.1965).

14. *Id.* at 777.

15. 15 U.S.C. § 77a et seq.

16. 15 U.S.C. § 19.

collected in Marco v. Dulles;[17] but *Marco* was a derivative action founded solely on diverse citizenship[18] in which the court was squarely presented with the issue of whether the Marco estate's equitable ownership of stock was sufficient to confer standing to sue derivatively. The *Marco* court concluded, upon a review of the leading state and federal decisions on the subject, that

"under the law of the state of incorporation of the corporations involved here, as well as the law of New York, the standing of an equitable shareholder is recognized."[19]

Although we think that *Treves* was correctly decided, that case which arose under the Securities Acts required for the reasons discussed below, that the court look explicitly to federal substantive law, or at least to federal policy to determine whether the state requirement was inconsistent therewith. The court's reliance on *Marco*, a diversity action under state law and hence requiring that state substantive law be applied, was therefore misplaced.

In the second case, Rosenfeld v. Schwitzer Corp.,[20] a shareholder derivative action based on § 14 of the Exchange Act[21] and diverse citizenship, the court raised but left open the issue decided here today, because the plaintiff there was "not disabled from maintaining a derivative action under [Indiana] state law."[22] Because California law, if applied, would bar this suit we are compelled to decide

"whether [§ 10(b)] of the Securities Exchange Act of 1934 impliedly prescribes separate federal standards for the status of shareholder seeking to vindicate those rights arising under the statute, and, if so, whether those standards are less stringent than the [here California] requirements."[23]

The starting point in our analysis must be that appellants' derivative right of action to vindicate a federally created corporate right is one which is conferred solely by federal law. The remedial incidents of this federally created right must, of necessity, also be controlled by federal law,[24] because the policy of uniformity within the federal system at least with respect to the issue at bar is paramount to any interests to be served by conformity with the variousness of state rules.[25]

That Congress intended to establish uniform enforcement of the Exchange Act is strongly indicated by § 27 of the Act,[26] which confers exclusive jurisdiction on the federal courts.[27] Moreover, although "Congress legislates against a background of existing state law,"[28] the Exchange Act also was enacted against a background of "a comprehensive body of federal law with respect to the bring-

---

17. 177 F.Supp. 533, 551–552 (S.D.N.Y.), appeal dismissed, 268 F.2d 192 (2d Cir. 1959).

18. *Id.* at 536.

19. *Id.* at 552.

20. 251 F.Supp. 758 (S.D.N.Y. 1966).

21. 15 U.S.C. § 78n(b).

22. 251 F.Supp. at 761 n. 2.

23. *Id.*

24. Fielding v. Allen, 181 F.2d 163, 167 (2d Cir.), cert. denied, [sub nom.] Ogden Corp. v. Fielding, 340 U.S. 817, 71 S.Ct. 46, 95 L.Ed. 600 (1950); Weitzen v. Kearns, 262 F.Supp. 931, 932 (S.D.N.Y. 1966), aff'd sub nom. Epstein v. Solitron Devices, Inc., 388 F.2d 310 (2d Cir. 1968); accord, Saylor v. Lindsley, 391 F.2d 965, 970 (2d Cir. 1968); Gilson v. Chock Full O'Nuts Corp., 331 F.2d 107, 109 (2d Cir. 1964) (en banc) (recovery of attorneys' fees in connection with § 16(b) action).

25. *See generally* Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L. Rev. 797 (1957) (hereinafter "Mishkin").

26. 15 U.S.C. § 78aa.

27. *Cf.* McClure v. Borne Chem. Co., 292 F.2d 824, 830, 833 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

28. Mishkin, *supra* note 25, at 811; *see also* H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 435 (1953).

ing of derivative suits." [29] Indeed, the derivative suit was initially developed early on by the federal courts within their historic equity jurisdiction.[30] As this court noted in Fielding v. Allen: [31]

"The [shareholder's derivative] action was early recognized by Chancery. It has long been familiar in the federal courts. And since the passage of the Act of March 3, 1875, 18 Stat. 470 [see 28 U.S.C. § 1331], conferring federal jurisdiction over cases arising under the Constitution and laws of the United States, many federal questions of importance have been raised in stockholder's derivative actions. Consequently, we think that the right of a stockholder to sue on his corporation's federal cause of action is itself federal in nature and therefore not subject to special requirements for cognate actions under state law [footnotes omitted]."

More significantly, we are concerned here with an important enforcement provision of a federal statute intended not only to expand the common law but to create new, far-reaching and uniform law of shareholder-management relations in congressionally designated areas of substantive corporation law,[32] which must not under the Supremacy Clause of the Constitution be subordinated to or otherwise hindered by the interposition of state requirements and limitations inconsistent with overriding federal policy.[33] The Supreme Court has mandated the federal courts " 'to adjust their remedies so as to grant the necessary relief,' where federally secured rights are invaded." [34] The mission to protect completely and effectively the rights of the investing public under the Exchange Act cannot cease at the implication of a private right of action under § 10(b) and Rule 10b–5.[35] To permit diverse state law, reflecting conflicting or at least varying state policies, to define "who is a 'shareholder' " for purposes of a derivative action under § 10(b) "would limit severely the scope of that section in an area comprehended by the statutory scheme," [36] and in many cases might render a nullity the very right which federal law has sought to provide.[37]

29. McClure v. Borne Chem. Co., 292 F.2d 824, 834 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

30. See Dodge v. Woolsey, 59 U.S. (18 How.) 331, 15 L.Ed. 401 (1855); Hawes v. City of Oakland, 104 U.S. 450, 26 L.Ed. 827 (1882).

31. 181 F.2d 163, 168 (2d Cir.), cert. denied, Ogden Corp. v. Fielding, 340 U.S. 817, 71 S.Ct. 46, 95 L.Ed. 600 (1950).

32. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 (2d Cir. 1968) (en banc), cert. denied, Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963); McClure v. Borne Chem. Co., 292 F.2d 824, 834 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Note, Negligent Misrepresentation Under Rule 10b–5, 32 U.Chi.L.Rev. 824, 832 n. 36 (1965).

33. See Board of Comm'rs v. United States, 308 U.S. 343, 350–352, 60 S.Ct. 285, 84 L.Ed. 313 (1939).

34. J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); cf. SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1965).

35. See Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951); see also McClure v. Borne Chem. Co., 292 F.2d 824 (3d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Jordan Bldg. Corp. v. Doyle, O'Connor & Co., 401 F.2d 47 (7th Cir. 1968); Boone v. Baugh, 308 F.2d 711 (8th Cir. 1962); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965).

36. McClure v. Borne Chem. Co., 292 F.2d 824, 835 (2d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

37. See Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1168–1169 (1965).

As stated by the Seventh Circuit in HFG Co. v. Pioneer Pub'g Co.: [38]

> "Furthermore, it seems unreasonable to think that the [Federal] Rule contemplates the right to proceed in a Federal court by one in whose name the stock has been issued merely because such stock is recorded but who as a matter of fact owns nothing and at the same time deny such right to one who owns all the equitable and beneficial interest in the stock merely because it was not issued in his name and therefore not of record. That is precisely the situation with which we are confronted."

Congress scarcely would have intended such an incongruous result, given the comprehensive statutory remedial scheme of the Exchange Act passed for the protection of investors, nor would Congress have intended the creation of a broad remedial scheme, the effectiveness of which could be varied by the whims and vagaries of state law.

As stated earlier, we hold that the applicable state law of standing should be applied to claims arising under state statutes or common law. Accordingly, the pendent claims under state corporate fiduciary law were properly dismissed below because California denies standing to beneficial shareholders.[39]

### III. EXISTENCE OF A § 10(B) CLAIM

*The Bankers Life Case*

The transactions and allegations involved in this case are closely analogous to those presented in Superintendent of Ins. v. Bankers Life & Cas. Co.,[40] decided by this court last July. The resolution of the remaining issues in this case are therefore controlled by that decision. The facts in *Bankers Life* involved a highly complex scheme to finance a takeover of Manhattan Casualty Co. (Manhattan) for the alleged purpose of looting it. In greatly simplified form, the scheme was effectuated through two securities transactions consummated the same day: first, the outstanding stock of Manhattan was sold by one shareholder to the new shareholder; second, Manhattan was caused to sell its portfolio of U. S. Government securities to obtain funds which that day were diverted to pay for the purchase of control of Manhattan. This court affirmed the dismissal of the complaint on the ground that no claim was stated for which relief could be granted under § 10(b) of the Exchange Act, and Rule 10b–5 thereunder, with respect to the purchase and sale of control of Manhattan, the sale of Manhattan's government securities or a combination thereof—even for the allegedly fraudulent purpose of acquiring control of Manhattan in order to loot it.

*The Sale of Control and the "Premium Bribe"*

Appellants seek to avoid the purchaser-seller requirement of Birnbaum v. Newport Steel Corp.,[41] with respect to the sale of control, by linking it via a conspiracy theory with the subsequent redemption transaction. They argue that *Birnbaum* is distinguishable from the case at bar, in that there the corporation was not

38. 162 F.2d at 536, 540 (7th Cir. 1947).

39. Gallup v. Caldwell, 120 F.2d 90, 93 (3d Cir. 1941) ; Bankers Nat'l Corp. v. Barr, 7 F.R.D. 305, 307 (S.D.N.Y.1945) ; *cf.* Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ; Weitzen v. Kearns, 262 F.Supp. 931 (S.D.N.Y.1966), aff'd *sub nom.* Epstein v. Solitron Devices, Inc., 388 F.2d 310 (2d Cir. 1968) ; Levine v. Bradlee, 248 F.Supp. 395, 398 (E.D.Pa.1965).

40. 430 F.2d 355 (2d Cir. 1970), aff'g 300 F.Supp. 1083 (S.D.N.Y.), cert. granted,

401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 321 (1971).

41. 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).
    *Birnbaum*, the progenitor of much of the law and conventional wisdom in the 10b–5 area, and the natural enemy of these appellants, stands as authority for the following propositions which bear upon this case: (1) § 10(b) protects only defrauded "buyers" and "sellers", (2) § 10(b) "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or

"involved" in the sale of control and that the sale therefore was not "in connection with" an "actionable [securities] transaction;" while here, it is alleged, the sale of control with its "premium bribe" was "not an isolated transaction, standing alone and to be judged by itself," but was "the first essential step in a series of [interrelated and cumulative] conspiratorial acts [which therefore] had a direct 'connection' with the unlawful 'repurchase' actionable under the Exchange Act." [42]

A similar claim was advanced and rejected in *Bankers Life* on the sole ground that the plaintiff corporation was neither a purchaser nor a seller of its own stock, even though it was a seller of its portfolio securities, the proceeds from which were used to finance the purchase of control of the plaintiff corporation. Here, as in *Bankers Life* and *Birnbaum*, the sale of control and the premium paid to the selling controlling shareholders did not involve the corporation in the capacity of either a buyer or a seller. The sale of the 40% controlling interest in Harvey Aluminum involved only the Harveys, on the one hand, and Martin Marietta, on the other. As the court held in *Bankers Life,* the allegation of a multi-transactional, pervasive and fraudulent conspiracy cannot create a right of action under § 10(b) merely by linking two transactions neither of which standing alone would violate that section. Thus, the purchaser-seller requirement of *Birnbaum,* which we have consistently reaffirmed,[43] requires the conclusion that the complaint, insofar as

it attacks the sale of control transaction, was properly dismissed.

### The Redemption of the Convertible Debentures

In *Bankers Life,* in holding that under § 10(b) and Rule 10b–5, fraudulent motive and purpose of a conspiracy and resultant corporate damage are not cognizable wrongs where the securities markets and securities investors are not adversely affected by a securities transaction, the court stated:

"Rule 10b–5 was not intended to provide a remedy for schemes amounting to no more than 'fraudulent mismanagement of corporate affairs.' Birnbaum v. Newport Steel Corp. [193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956 [72 S.Ct. 1051, 96 L.Ed. 1356] (1952)]. The scope of the rule must be assessed in light of the purposes of the legislation from which it derives, which we recently found to be 'to promote free and open public securities markets and to protect the investing public from suffering inequities in trading * * *' SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 858 (2d Cir. 1968), (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969)." [44]

The alleged looters in *Bankers Life* may well have ultimately deceived Manhattan by concealing their intention to misappropriate the proceeds of the sold portfolio securities for the consummation of the alleged conspiracy. Nevertheless, this court, upon noting the ab-

purchase of securities" (this statement was broadened by this court in A. T. Brod & Co. v. Perlow, 375 F.2d 393, 395 (1967), discussed *infra*, at n. 54) ; and (3) § 10(b) was not directed "at fraudulent mismanagement of corporate affairs." For a discussion of the evolution of the law along the three main branches of *Birnbaum, see generally* Bloomenthal, From Birnbaum to Schoenbaum: The Exchange Act and Self-Aggrandizement, 15 N.Y.L.For. 332 (1969) ; Fleischer, "Federal Common Law": An Assessment, 78 Harv.L.Rev. 1146 (1965).

42. Appellants' Br. at 19–21.

43. *See, e. g.,* Iroquois Industries Inc. v. Syracuse China Corp., 417 F.2d 963, 967 (2d Cir. 1969) ; Greenstein v. Paul, 400 F.2d 580, 581 (2d Cir. 1968). *See also* Rekant v. Desser, 425 F.2d 872 (5th Cir. 1970) ; *but see* Lowenfels, The Demise of the Birnbaum Doctrine, 54 Va. L.Rev. 268 (1968).

44. 430 F.2d at 360.

sence of an allegation in the complaint "that the full and fair market price was not paid for those bonds by their purchaser," [45] concluded that "since neither the purchaser nor the seller of the bonds was deceived or defrauded," [46] no 10b–5 claim was stated because the alleged fraud was not "in connection with" the securities transaction. The court reasoned as follows:

> "The fraud alleged in this case in no way [adversely] affected either the securities markets or the investing public. No stockholders were defrauded, no investor injured. The purity of the security transaction and the purity of the trading process were unsullied." [47]

In short, § 10(b) liability arises only when the alleged fraud between the parties [48] and/or alleged market manipulation or deception [49] is intrinsic to the securities transaction itself.[50] Where this prerequisite is not met, as here, no federally cognizable interest exists, and the complaint must be dismissed.

The only fraud "in connection with" Harvey Aluminum's redemption was that it was perpetrated by insiders as an essential element of the conspiracy to acquire control for Martin Marietta and to avoid dilution of that control position at a time when Harvey Aluminum was borrowing funds at record high interest rates. There is no claim that the alleged fraud in any way infected the redemption transaction nor could there be; the redemption was effected in accordance with the terms of the debentures. There is also no claim that the appellees employed any "manipulative or deceptive device or contrivance" with respect to the redemption which might have adversely affected the securities markets and/or the investing public. In the words of *Bankers Life*, "[t]he purity of the security transaction and the purity of the trading process were unsullied." [51]

---

45. *Id.*

46. *Id.*

47. *Id.* at 361.

48. *See*, e. g., Schoenbaum v. Firstbrook, 405 F.2d 215 (en banc), rev'g 405 F.2d 200 (2d Cir. 1968), cert. denied, Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

49. *See, e. g.,* Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

50. In his very careful and thoughtful opinion in *Bankers Life*, which analyzed § 10(b), Rule 10b–5 and the relevant cases thereunder decided by this court and the other courts in this Circuit, Judge Herlands summarized the four principal categories of situations in which the requirements of the phrase "in connection with" are met:

> "In order to sustain a complaint alleging fraud under section 10(b) of the 1934 Act, it must appear with reasonable clarity from the face of the complaint either (1) that a purchase or sale of securities is at the crux of a fraudulent scheme; or (2) that inducing a purchase or sale of securities is the object of a fraudulent scheme; or (3) that fraudulent statements, misstatements, or omissions are made in a manner which is reasonably calculated to influence the investing public, or are of the sort which the reasonable investing public might rely upon; or (4) that the trading process is abused through potential market manipulation or the spread of watered stock."

300 F.Supp. at 1101. Judge Herlands then succinctly stated the critical jurisdictional distinction between § 10(b) and nonfederal antifraud claims, as follows:

> " * * * Rule 10b–5 requires the employment of fraud in connection with a security transaction, which is essentially different from the effectuation of a security transaction in connection with a fraudulent activity."

300 F.Supp. at 1102.

51. 430 F.2d at 361; *see also* 300 F.Supp. at 1101. *Compare* Schoenbaum v. First-

We thus find the factual situation indistinguishable in any material respect from that presented in *Bankers Life*;[52] therefore, this aspect of appellants' case must also fall under the weight of the authority of that case.[53]

## CONCLUSION

Even giving § 10(b) and Rule 10b–5 the most liberal construction, *i. e.*, that courts should not blind themselves to the fact that "Congress' purpose in enacting § 10(b) of the Exchange Act was to protect the public by broadly prohibiting *all* fraudulent schemes in connection with the purchase or sale of securities," irrespective of their novelty or atypicality,[54] nothing is to be found in the history of that legislation, or in subsequent discussions thereunder, to indicate that Congress was enacting securities legislation for the purpose of conferring jurisdiction on the federal courts over corporate mismanagement situations absent fraud intrinsic to the securities transaction itself, which is all that the facts of this case present. Appellants have their remedies in other forms for such misfeasance as there may have been.

Affirmed.

brook, 405 F.2d 215 (en banc), rev'g, 405 F.2d 200 (2d Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Cooper v. North Jersey Trust Co., 226 F.Supp. 972 (S.D.N.Y. 1964); New Park Mining Co. v. Cramer, 225 F.Supp. 261 (S.D.N.Y.1963); Pettit v. American Stock Exch., 217 F. Supp. 21 (S.D.N.Y.1963).

52. To recapitulate, the gravamen of the complaint or the "essence of the fraud" in *Bankers Life* was the allegedly fraudulent diminution, diversion and misappropriation of Manhattan's assets as part of a broader scheme by Bankers Life and others to facilitate, indeed enable, a transfer of control of Manhattan. The gravamen of appellants' complaint is that Harvey Aluminum and its independent shareholders were defrauded and damaged by the corporation's being caused to become a "forced purchaser" of its entire issue of convertible debentures, the redemption of which was financed out of extremely scarce corporate financial resources, as part of Martin Marietta's strategy of control acquisition and entrenchment with respect to Harvey Aluminum.

53. In view of our holding that appellants have failed, in any event, to state a § 10(b) and Rule 10b–5 claim, it is unnecessary to decide whether Harvey Aluminum's redemption of its convertible debentures was a "purchase" within the meaning of the Exchange Act. *Cf.* SEC v. Sterling Precision Corp., 393 F.2d 214, 218 (2d Cir. 1968) (construction of the Investment Company Act of 1940, wherein a redemption of preferred stock was held not to be a "purchase"); *but see* Levine v. Seilon, Inc., 439 F.2d 328, (2d Cir. 1971) (redemption of preferred stock assumed, without being held, to be a "purchase" within the meaning of the Exchange Act).

54. A. T. Brod & Co. v. Perlow, 375 F.2d 393, 395 (2d Cir. 1967).

The quoted language in *Perlow* expanded the scope of § 10(b) and Rule 10b–5 and represented a departure from the instruction in *Birnbaum* that those provisions prohibited only those types of fraud "usually associated with the sale or purchase of securities." 193 F.2d at 464. This expansion is in conformity with the Supreme Court's instruction that important Exchange Act terms and phrases such as "security," "purchase," "sale," "in connection with," etc., are to be infused with a special meaning which embody

"a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

Tcherepnin v. Knight, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967). *See also* SEC v. National Securities, Inc., 393 U.S. 453, 466–467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Yet this departure from the strictures of *Birnbaum*, by its very terms, did not throw open the doors of the federal courts to every claimed violation of insider fiduciary duty. From *Birnbaum*, 193 F.2d at 463–464, to date, this court's expansionary statements have always been tempered by recognition and implementation of the important limiting statutory phrase, "in connection with."

SMITH, Circuit Judge, dissenting:

I respectfully dissent.

The majority relies almost exclusively on the recent holding of this court in Superintendent of Insurance v. Bankers Life and Casualty Company, 430 F.2d 355 (2d Cir. 1970), cert. granted, 401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 321 (1971), in holding that the appellants failed to set forth a *prima facie* violation of section 10(b) and Rule 10(b) (5). The distinction between that case and the one at bar appears to me to be clear and obvious. In *Bankers Life* the Manhattan Casualty Company was a wholly owned subsidiary of Bankers Life and Casualty. Two individuals agreed to purchase all of Manhattan's stock for $5 million. This stock was paid for with a loan in the same amount which the purchasers secured from the Irving Trust Company. The $5 million loan from Irving Trust was repaid on the same day with the proceeds from the sale of $5 million of U. S. Government Treasury Bills held in the Manhattan portfolio which the purchasers sold as soon as they acquired the stock of Manhattan. Through various transfers the books of Manhattan failed to show the decrease of $5 million in the company's assets which resulted from the transactions. After the nature of the operation was discovered, the company was placed in liquidation, and the Insurance Commissioner brought a derivative action under the federal securities laws on behalf of Manhattan. This court held that while there was undoubtedly gross fraud involved, it did not constitute a violation of section 10(b) because it involved a misappropriation of company funds which was unrelated to the securities transactions.

The fraud which harmed the plaintiffs consisted of the failure of Sweeny and his associates to account for the proceeds. There is a structural difference between the sale of the corporation's bonds at a concededly fair price and the subsequent fraudulent misappropriation of the proceeds received. * * *

The fraud alleged in this case in no way affected either the securities or the investing public. No stockholders were defrauded, no investor injured. The purity of the security transaction and the purity of the trading process were unsullied. There was no danger that the securities sold would be overvalued on reaching the public markets. 430 F.2d at 360–361.

In the present case, on the other hand, the appellants claim that by repurchasing the securities it had originally issued in order to perpetuate Martin's control position, the appellees depleted the assets of the corporation to the detriment of the company and the remaining shareholders. The bonds bore a rate of interest of 5½%. At the time and subsequent to the transaction Harvey was concededly borrowing at rates as high as 9% thus clearly reducing the net worth of the company.

The factual setting of the present case is very similar to that presented to this court in Schoenbaum v. Firstbrook, en banc, 405 F.2d 215 (2d Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). That was a derivative action brought on behalf of the Banff Oil Company, Ltd. against the Aquitaine Corporation which had earlier acquired control of Banff through a tender offer and thereafter designated three of the eight members of Banff's board of directors. Following the acquisition of the Banff stock by Aquitaine the two companies undertook joint explorations for oil which were soon successful. After the discovery of the oil deposits, but before their public announcement, Banff sold 500,000 shares of its stock to Aquitaine at the then prevailing market price of $1.35 per share. After the discovery became known, the price of the stock rose rapidly to as high as $18 per share. The plaintiffs contended that the sale of this stock to Aquitaine at the time when the success of the explorations was known to the directors of Banff, but not publicly, acted to defraud Banff, since the price was grossly inadequate, and constituted a vi-

olation of the federal securities laws. This court in reversing the district court's granting of summary judgment for the defendants held that a *prima facie* violation of section 10(b) and Rule 10(b) (5) had been established. [See, e. g. Ruckle v. Roto American Corporation, 339 F.2d 24, 29 (2d Cir. 1964); Pappas v. Moss, 393 F.2d 865 (3rd Cir. 1964).]

The only distinction that I can see between the present case and *Schoenbaum* is that here the directors of Harvey, influenced by a conflict of interest and acting to support Martin's controlling interest, caused the corporation to be a "forced purchaser" rather than a "forced seller." In each case the corporation sustained damage—in *Schoenbaum* Banff received inadequate consideration for its stock, where as here Harvey was subjected to a loss of working capital and obliged to pay substantially higher interest rates. Following *Schoenbaum*, therefore, I would find that the appellants have successfully made out a section 10(b) claim.

Since I am of the view that a section 10(b) violation has been properly alleged, it is necessary to consider the question of whether there was a "purchase or sale" of a security within the meaning of section 10(b) and Rule 10(b) (5). Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as neces-

sary or appropriate in the public interest or for the protection of investors.

Rule 10(b) (5) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

This court has consistently given a broad and liberal reading to section 10 (b). As we recently noted in Crane Co. v. Westinghouse Air Brake Company, 419 F.2d 787, 798 (1969), "[t]he purchase-sale requirement must be interpreted so that the broad design [of the statutes] \* \* \* is not frustrated by the use of novel or atypical methods." Appellees here rely on Judge Friendly's opinion in S. E. C. v. Sterling Precision Corporation, 393 F.2d 214 (2d Cir. 1968) holding that a redemption of convertible debentures was not a "purchase" within the meaning of section 17(a) of the Investment Company Act of 1940, but rather merely the repayment of a pre-existing debt. In reaching this conclusion, however, the court relied primarily on the fact that the 1940 Act used the words "purchase" and "redemption" separately and independently indicating the intent of Congress to define them differently, the legislative history of the Investment Company Act, and the court's

view that a contrary interpretation would be inconsistent with other provisions of that statute.

Under the Securities Exchange Act of 1934, however, an "equity security" is defined in section 3(a) (11) as "any stock or similar security; or any security convertible, with or without consideration, into such security. * * *" This indicates a clear intention on the part of the drafters of the Act to include a convertible debenture within the broad definition of the term "security" as used throughout this statute, rather than considering it solely as a debt instrument. Such an interpretation is in accord with the common sense view of what the transaction in the present case was designed to accomplish. By "redeeming" the bonds here Harvey was buying back the bondholders' rights to obtain common stock by conversion and thereby reducing the amount of its outstanding common stock in the same way as if it had entered the open market and purchased shares for its treasury. I would find, therefore, the redemption of convertible securities to be a "purchase" within the meaning of the Securities Act of 1934. Such a reading seems most consistent with the clear intent of Congress to give the Commission the broadest control over transactions capable of being abused to the detriment of the investing public. As the Seventh Circuit noted in discussing this question in Dasho v. Susquehanna Corporation, 380 F.2d 262, 266 (7 Cir. 1967):

> Our attention is called to Sections 3(a) (13) and 3(a) (14) of the Exchange Act * * * which define the word "purchase" to "include any contract to buy, purchase, or otherwise acquire" and "sale" to "include any contract to sell or otherwise dispose of." This broad language indicates an intention by Congress that the

words "purchase" and "sale" are not limited to transactions ordinarily governed by the commercial law of sales. The purpose is evidently to make control of securities transactions reasonably complete and effective to accomplish the purpose of the legislation.

Before FRIENDLY, Chief Judge, and SMITH, KAUFMAN, HAYS, FEINBERG, MANSFIELD, MULLIGAN, OAKES and TIMBERS, Circuit Judges.*

## ON REHEARING IN BANC

J. JOSEPH SMITH, Circuit Judge:

Plaintiffs, shareholders in Harvey Aluminum, Inc., brought in the United States District Court for the Eastern District of New York a derivative action seeking damages on behalf of the corporation for losses allegedly suffered when, as a result of a conspiracy between Martin Marietta and the controlling shareholders in Harvey Aluminum, Lawrence A. and Homer M. Harvey, the Harveys sold out their controlling interest to Martin Marietta at a premium but remained on the board of directors and caused an improvident redemption of convertible debentures in order to prevent their conversion and consequent dilution of Martin Marietta's voting control.[1] Plaintiffs seek to recover for the corporation both the alleged "premium bribe" and damages caused by the allegedly improvident redemption. The court, Anthony J. Travia, *Judge,* dismissed the action holding section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5 not applicable. A divided panel of this court affirmed (453 F.2d 722, July 21, 1971), relying largely on Superintendent of Insurance v. Bankers Life & Casualty Co. et al., 430 F.2d 355 (2d Cir. 1970), since reversed, 404 U.S. 6, 92 S.Ct. 165, 30

---

* Circuit Judges Lumbard and Moore, who were on the original panel, elected not to participate in the consideration of this case *in banc.*

1. For a more complete statement of the claims see the panel opinion, 453 F.2d 722 (1971).

L.Ed.2d 128, (1971). On rehearing *in banc* we find error in the dismissal of the action and reverse and remand to the district court for further proceedings.

■ For the reasons stated in the panel opinion we agree that appellants have standing to sue. We hold, however, that section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5 apply and that a sufficient claim is stated of fraud against the corporation in connection with the redemption of the debentures, a "purchase" within the meaning of the statute and rule.[2] This plainly follows from the opinion of the Supreme Court in reversing this court's decision in Superintendent of Insurance v. Bankers Life & Casualty Co., et al., *supra*.

There the Court held that a good case was stated of fraud under the Act when the seller of bonds was duped into believing that it, the seller, would receive the proceeds of an otherwise legitimate sale.[3] It was held sufficient that the seller "suffered an injury as a result of deceptive practices touching its sale of securities as an investor." *See also*, Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

■ Since the plaintiffs have standing under section 10(b) of the Act to assert on behalf of the corporation rights against the defendants arising from one aspect of an alleged scheme, the debenture

2. Reliance by the defendants on SEC v. Sterling Precision Corp., 393 F.2d 214 (2d Cir. 1968) in contending that there is no purchase here is misplaced. At issue there was the definition of "purchase" within the meaning of § 17(a)(2) of the Investment Company Act of 1940. We have indicated that a broader meaning may be given to the term as used in section 10(b) of the Securities Exchange Act, see, e. g., Levine v. Seilon, Inc., 439 F.2d 328, at 332 (2d Cir. 1971). Rule 10b–5 makes it unlawful "by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, to . . . engage in any act . . . which operates . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

An "equity security" is defined in the Act as "any stock or similar security; or any security convertible, with or without consideration, into such security. . . . ." A convertible debenture is such a security and by redeeming the debentures here Harvey was acquiring the bondholders' rights to obtain common stock by conversion and thereby reducing the outstanding rights to interests in the equity securities of the corporation to the same extent as though it had purchased common shares on the open market.

3. "The Congress made clear that 'disregard of trust relationships by those whom the law should regard as fiduciaries, are all a single seamless web' along with manipulation, investor's ignorance, and the like. H.R.Rep.No.1383, 73d Cong., 2d Sess., p. 6. Since practices 'constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers' in the regulatory agency 'have been found practically essential.' *Id.*, at 7. Hence, we do not read § 10(b) as narrowly as the Court of Appeals; it is not 'limited to preserving the integrity of the securities markets' (430 F.2d, at 361), though that purpose is included. Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b), whatever might be available as a remedy under state law.

We agree that Congress by § 10(b) did not seek to regulate transactions which comprise no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face-to-face."

[Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, at 10, 92 S.Ct. 165, at 168, 30 L.Ed.2d 128.]

738

redemption, the court may exercise pendent jurisdiction over other claims on behalf of the corporation against the same defendants arising from other aspects of the same transaction.[4] The doctrine of pendent jurisdiction is operative if those additional claims arise under state law; there would be no question of the propriety of this court's hearing them if they arose under federal law. We need therefore determine neither whether the claimed "premium bribe" taken separately is, as the SEC in its amicus brief contends, another ground for 10(b) jurisdiction nor whether plaintiffs would have standing to assert such a claim divorced from the present action.

The Commission urges us to take this opportunity to review and repudiate the purchaser-seller requirement for 10b–5 actions which we enunciated in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), an invitation we declined as recently as our decisions in Levine v. Seilon, Inc., 439 F.2d 328 (2d Cir. 1971) and GAF Corporation v. Milstein, 453 F.2d 721, 722 (2d Cir. 1971). See also, Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). At this stage of the case we see no pressing need for such consideration. We need not at this time, pending full development of the facts on trial, review here either the present limits of *Birnbaum* or *Schoenbaum* or the nature or extent of relief which the facts as developed may require. We are satisfied that the case was properly before the district court, that dismissal was error and that remand for further proceedings is required.

---

4. The decision on whether to hear claims under pendent jurisdiction involves two questions: whether the court has "power" to hear the state claims and whether, in its discretion, it ought to do so. The derivation of all claims in this case from the same operative facts makes this an instance in which the court can exercise pendent jurisdiction, under the standard of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). And considerations of judicial economy, fairness to the parties, and convenience, which influence the exercise of discretion, compel the conclusion that all claims ought to be heard in one proceeding. See Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 809–811 (2d Cir. 1971); Ryan v. J. Walter Thompson Co., 453 F.2d 444, 446 (2d Cir. 1971).