In re The PITTSBURGH AND LAKE ERIE RAILROAD COMPANY SECURITIES AND ANTITRUST LITIGATION,

Appeal of OBJECTOR IRVING TRUST COMPANY, as Trustee.

No. 76-1089.

United States Court of Appeals, Third Circuit.

Argued May 4, 1976.

Decided Sept. 1, 1976.

David H. Pittinsky, Lawrence D. Berger, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellant; Stephen A. Weiner, Winthrop, Stimson, Putnam & Roberts, New York City, of counsel.

Gilbert J. Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Liaison Counsel, for defendants-appellees.

Victor Wright, Henry C. Fader, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for plaintiffs-appellees.

Frederick N. Egler, Egler & Reinstadtler, Pittsburgh, Pa., Phillip H. Strubing, Nancy J. Gellman, Pepper, Hamilton & Scheetz, Thomas M. Kittredge, Arthur R. Littleton, Morgan, Lewis & Bockius, Lewis H. Van Dusen, Jr., Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Thomas B. Rutter, Mitchell S. Pinsly, Joseph Neff Ewing, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., Eben H. Cockley, Robert J. Hoerner, Jones, Day, Cockley & Reavis, Cleveland, Ohio, John J. McCarty, James F. Mundy, Raynes, McCarty & Binder, Philadelphia, Pa., J. Howe Brown, Booth, Prichard & Dudley, Fairfax, Va., for defendants-appellees.

Before ALDISERT, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Appellant Irving Trust Company (Irving) is a trustee under two trust indentures executed by the predecessors of Penn Central Transportation Company (Penn Central) in anticipation of the public sale of their bonds. Pursuant to the terms of these indentures Penn Central pledged with and delivered to Irving as security a total of 116,698 shares of its stock in The Pittsburgh and Lake Erie Railroad Company (P&LE).[1] Irving, as pledgee of 22.5% of P&LE's outstanding stock, appeals from an order of the district court approving over its objections, the settlement of a series of class shareholder derivative actions brought by P&LE minority shareholders. The defendants in these actions were P&LE, certain of its officers and directors, certain present and former officers of Penn Central and others (including some banks and their employees). The parties to the settlement all contend that Irving, a nonparty, lacked standing to be heard in the district court in objection to the settlement. They would prefer that on this ground we refrain from reviewing the fairness of the settlement. But assuming that we recognize Irving's standing to object, they urge that the order approving the settlement be affirmed as a fair disposition of the class and derivative suits. We conclude that Irving did have standing to be heard in objection to the settlement, and that the district court abused its discretion in approving it. Accordingly, the settlement order must be vacated.

## I. THE RELEVANT PROCEEDINGS BELOW

The settlement order arises out of eight separate actions filed in seven different dis-

1. By a Collateral Trust Indenture dated April 15, 1965, New York Central Railroad Company pledged 78,000 shares of P&LE stock to secure a bond issue of up to $9,800,000. By a Collateral Trust Indenture dated April 15, 1968, Penn Central Company pledged 83,698 additional shares of P&LE stock to secure a bond issue of up to $13,941,400. The P&LE shares, together with duly executed stock powers, were delivered on the respective dates of the indentures and remained in Irving's possession on June 21, 1970. On that date Penn Central committed an act constituting an event of default under both indentures by filing a petition for reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205.

tricts by minority shareholders of P&LE. Six of these actions, by order of the Judicial Panel on Multidistrict Litigation, were transferred pursuant to 28 U.S.C. § 1407 to the Eastern District of Pennsylvania where two of the actions were already pending.[2] The pleadings establish that Penn Central owns approximately 93% of the outstanding capital stock of P&LE, including the 161,198 shares pledged to Irving. The remaining 7% is publicly held. The derivative-suit plaintiffs charge the actual defendants[3] with (1) violations of § 10 of the Clayton Act, 15 U.S.C. § 20, which prohibits certain transactions between carriers having interlocking directorates; (2) violations of the federal securities laws for omitting information pertaining to these negotiated transactions from the 1969 P&LE Annual Report and for failing to register certain loan transactions; and (3) violations of fiduciary obligations imposed by state law. The class action plaintiffs, on behalf of all owners of the 7% publicly-held stock, charge P&LE and the other defendants with the same violations of § 10 of the Clayton Act. Both the federal and state law claims allege that in a series of transactions antedating the filing of its petition for reorganization, Penn Central (the 93% shareholder) was permitted to raid the assets of P&LE to the latter's detriment. Specifically, the plaintiffs claim that defendants improvidently permitted P&LE to make a series of loans to Penn Central at inadequate interest rates and at a time when they knew or should have known of the latter's precarious financial condition, and to enter into a conditional sales agreement with Penn Central to finance rolling stock at an excessive rate of interest.

Various interlocutory rulings, including the dismissal of the class action antitrust

suit for failure to state a claim upon which relief could be granted, are set forth in the reported decisions of the district court.[4] Significantly bearing on the issues raised in this appeal is Judge Gorbey's most recently reported decision in this litigation.[5] Certain defendants had moved for a pretrial ruling limiting their liability to 7% of any damage allegedly sustained by P&LE. They proposed that any judgment be awarded directly to the 7% minority shareholders rather than to the corporation, thereby effecting a parity of benefits between these shareholders and Penn Central. Penn Central, they contended, had already been the principal beneficiary of the challenged transactions, and, as 93% shareholder, would benefit again from any recovery by P&LE. Holding that these derivative plaintiffs met the contemporaneous stock ownership requirement of Rule 23.1, Fed.R. Civ.P., and that P&LE would not reap a windfall if full recovery were permitted on behalf of the injured corporation, the court distinguished *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), upon which the moving defendants had relied. In denying the motion to limit recovery, the court also emphasized that unlike the unique situation in *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), where a direct pro rata recovery by the minority shareholders had been permitted, the best interests of P&LE and the general public (in the enforcement of the federal securities and antitrust laws) would not be served by limiting the recovery to 7% of the alleged damages.[6]

Once this decision was announced by the district court, it became obvious that all the defendants were potentially exposed to a

**2.** *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitr. Lit.*, 374 F.Supp. 1404 (Jud.Pan.Mult.Lit. 1974) (per curiam).

**3.** In the derivative suits, of course, P&LE is only a nominal defendant.

**4.** *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitr. Lit.*, 387 F.Supp. 906 (E.D.Pa.1974); *In re Pittsburgh & Lake Erie R.R. Co. Sec. &*

*Antitr. Lit.*, 378 F.Supp. 441 (E.D.Pa.1974) (dismissal of class action claims); *Crowell v. Pittsburgh & Lake Erie R.R. Co.*, 373 F.Supp. 1303 (E.D.Pa.1974).

**5.** *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitr. Lit.*, 387 F.Supp. at 908.

**6.** *Id.* at 909–12.

huge liability. At the same time it was clear that since Penn Central was already in the process of reorganization, it was, as a practical matter, judgment proof. This left the individual and bank defendants potentially liable for all of the $30,000,000 damage allegedly suffered by P&LE. Shortly before a date was set for what promised to be a protracted trial, appellees proposed a settlement to the district court. Apparently acting pursuant to the last sentence of Rule 23.1, Fed.R.Civ.P., the district court ordered publication of notice of the proposed settlement and fixed a date for a hearing thereon. Irving received the notice and filed written objections to the terms of the settlement.

Under the proposed settlement a fund of $2,250,000 was created into which P&LE would contribute $2,100,000 and the individual and bank defendants $150,000.[7] From the settlement fund $750,000 would be distributed to plaintiffs' attorneys, and the remaining $1,500,000, after deducting court costs, would be distributed to the 7% minority shareholders but not the individual defendants. In addition, P&LE and the trustees of Penn Central would exchange releases, thereby effecting a discharge of a loan balance of $12,800,000 (probably uncollectable) due to P&LE from Penn Central as of June 21, 1970. The proposed release would also discharge the liability (also probably uncollectible) of the Penn Central estate for damage to P&LE from other transactions which allegedly violated § 10 of the Clayton Act and state law fiduciary duties. The Penn Central trustee agreed, subject to the approval of the reorganization court

(which was obtained in a separate proceeding) that no distribution of the settlement fund would be made in favor of the 93% of P&LE shares held in Penn Central's name. Finally, all parties to the settlement would exchange releases *inter sese* as to all claims, including any claims for indemnity, and P&LE received an assurance from Penn Central that past tax allocations would not be recomputed.[8] Thus, the primary effect of the proposed settlement was that from the P&LE equity attributable to the 93% shareholder, P&LE, on whose behalf the suit was brought, would pay the plaintiffs' attorneys fees and make a special one-time distribution to the 7% public shareholders.

At the hearing on Irving's objection the two indentures of which it is trustee were made a part of the record. Both provide that prior to default Penn Central has the right to vote the pledged stock, but that no proxy or power of attorney to vote the stock shall be used for any purpose inconsistent with the terms of the indenture.[9] Both provide that after an event of default (of which filing the reorganization petition was one) Irving may, without Penn Central's consent, "take such steps as in its discretion it shall deem necessary to protect the interest of the holders of the Bonds in respect of any collateral security at any time pledged . . . either by instituting or requesting or authorizing the institution of any legal proceedings to enforce payment of the collateral security or interest [10] thereon or to foreclose any lien securing the same, or otherwise to act in respect of the collateral security . . ."[11] Both indentures also give Irving the power upon

---

**7.** The apparent basis for apportioning the respective contributions to the settlement fund was that the plaintiffs claimed that Penn Central had benefited from P&LE to the extent of $30,000,000, and that the minority shareholders' pro rata loss was 7% of that sum, or $2,100,000. In order to prevent dilution of the 7% minority shareholders' equity implicated in P&LE's payment into the fund, the individual defendants were assessed $150,000 (roughly 7% of $2,100,000).

**8.** *See* Stipulation of Settlement and Compromise, App. at 14–17.

**9.** § 24, Collateral Trust Indenture 4–15–65, Supp.App. at 30b–31b; § 24, Collateral Trust Indenture 4–15–68, Supp.App. at 97b. [Hereinafter only the section and the term Collateral Trust Indenture will be noted].

**10.** Interest refers to the return on the other collateral, certain New York Central Refunding and Improvement Mortgage bonds, which were pledged as security under the indentures. These bonds were of dubious value after the filing of the reorganization petition.

**11.** § 25, Collateral Trust Agreement.

default to foreclose the pledge by sale of the collateral.[12] It was established at the hearing, however, that in Order No. 1 of the Penn Central reorganization proceeding, foreclosure of the pledge had been enjoined. But in accordance with a subsequent agreement between Irving and the Trustees of Penn Central, which was approved by the reorganization court in Order No. 497 of November 18, 1971, dividends on the pledged P&LE stock were to be used in part to limit to six months the arrearage in interest on the Penn Central bonds secured by Irving's indentures.

The principal balance due to the bondholders at the time of the settlement hearing was $15,441,800. There was evidence that at the time of this hearing the bid price of P&LE stock traded in the over-the-counter market was $80 per share. Thus, the market value of the Irving collateral, assuming it could have been sold, and assuming also that a sale of so large a minority interest would not require a substantial discount from the bid price, was less than $13 million. Prima facie then, Irving's bondholders were substantially undersecured. In any equitable sense the bondholders, not Penn Central, owned the 22.5% of P&LE stock pledged to Irving. Yet the settlement would dilute the pledgee's equity in P&LE by approximately $472,500 (22.5% of $2.1 million) and would deplete the net working capital on which the bondholder's receipt of interest under Order No. 497 depended.

Irving, in its written objections, contended that the proposed settlement was illegal and fundamentally unfair.[13] The district court disposed of this objection as follows:

> 38. The proposed settlement is not unfair with regard to bondholders under the Collateral Trust Indentures. The dividends which Penn Central receives from P&LE are used by Penn Central to pay the interest to the bondholders. Interest is not more than six months in arrears

and the settlement will not affect P&LE's ability to continue paying dividends at the rate paid in the past. Nor will the settlement materially affect the value of P&LE stock pledged to Irving Trust Company. In short, Irving Trust Company is *not* a minority shareholder of P&LE, and neither it nor the bondholders has standing to object. The bondholders have, through Irving Trust as pledgee, already been granted an arguably preferential status by Judge Fullam in the *Penn Central Reorganization Proceedings* as beneficiaries of the escrow agreement (Opinion and Order No. 497, November 18, 1971, Civil Action # 70–347), but Judge Fullam expressly declined to recognize in Irving Trust any right impairing the degree of ownership and control possessed by the Penn Central Trustees which permits consolidated-return treatment and the concomitant on-going benefit to the Penn Central estate of the tax allocation agreement in effect as to the P&LE. We agree with Judge Fullam's conclusion that the Penn Central Trustees and not the Irving Trust own the P&LE shares pledged as collateral. Any other finding would result in a windfall to bondholders who have no interest in this matter.[14]

It is not clear what the court meant by this paragraph of the order approving the settlement. Appellees, who prepared the text of the order, present three alternative interpretations in their consolidated brief: (1) that this paragraph is a determination that Irving lacked standing to object to the terms of the settlement; (2) that it is a finding that the settlement is fair to Irving since it does not affect the value of the collateral under the trust indentures; or (3) that it is a recognition by the district court that the order of the reorganization court approving this settlement, from which no appeal was taken, must be given collateral estoppel effect against Irving. Irving, on

---

**12.** § 31, Collateral Trust Agreement.

**13.** *See* Objections of Irving Trust Company, as Trustee, To Proposed Settlement, App. at 34a–39a.

**14.** Finding 38, App. at 79a.

the other hand, contends: (1) that it did have standing to object to the settlement; (2) that its bondholders' interests were adversely affected by the terms of the settlement, which is fundamentally unfair; and (3) that the reorganization court did not and could not pass on the merits of the settlement's effect on the bondholders' interest.

## II. THE MOTION TO DISMISS THE APPEAL

The appellees moved before this court to dismiss the appeal on the ground that Irving, having no standing to object to the settlement, cannot appeal. A party denied standing to sue, or to intervene, or to object, may obviously appeal such a determination. The question of standing does not go to whether or not the appeal should be heard, but rather to its merits.[15] Accordingly, the motion to dismiss the appeal will be denied.

## III. IRVING'S STANDING TO OBJECT TO THE SETTLEMENT

In determining Irving's standing to object to the settlement, we must, of course, assume the truth of its claim that the security of its bondholders will be adversely affected by the implementation of the settlement. The question is whether, assuming this is so, the law permits Irving to be heard.

### A. Choice of Law Considerations

In its order approving the settlement the district court did not adequately develop the somewhat complex issues of choice of law lurking in the standing question. Irving is an indenture trustee with duties prescribed to some extent by federal law.[16] It acts under indentures executed, so far as

we can tell from the record, in New York. One indenture was made by New York Central, a Delaware Corporation, and the other by Penn Central Company, a Pennsylvania corporation. The stock pledged under both indentures was issued by P&LE, a Delaware corporation. The proposed settlement disposes of a derivative suit alleging claims arising under both federal and state law.

Irving, while it maintains that it should be treated as an owner of P&LE shares for purposes of determining standing, also claims that the settlement of a derivative suit which involves the distribution of the nominal corporate defendant's assets may affect persons other than shareholders holding an interest in that corporation's securities. A pledgee of any corporate security, it urges, has an interest in the assets of the issuer which may be adversely affected by a distribution of those assets. Irving's separate interests, as an equitable owner of P&LE stock, and as a creditor of Penn Central holding a security interest in securities of P&LE, however, may not be governed by the same law. While the status of an equitable shareholder may implicate the law of Delaware under which P&LE was incorporated, the status of a creditor of Penn Central, having a derivative interest in the P&LE assets, may depend either upon the law of the place where the debt obligation was incurred (in this case apparently New York), or upon a federal standard because of the pervasive federal interest manifested in the several federal statutes regulating the extraction of debt capital from the national security markets.[17]

A further complication present in this case is that, at least to the extent that choice of law is a state law issue, the transferee court may be required to take into account the choice of law rules of the six other territorial jurisdictions[18] from which

---

15. See, e. g., Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

16. See The Trust Indenture Act of 1939, 15 U.S.C. § 77aaa et seq.

17. See, e. g., Securities Act of 1933, 15 U.S.C. § 77a et seq.; Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.; Trust Indenture Act of

1939, 15 U.S.C. § 77aaa et seq.; Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq.; Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq.

18. A list of these jurisdictions is reported in In re Pittsburgh & Lake Erie R. Co. Sec. & Antitr. Lit., 374 F.Supp. at 1405.

these suits were transferred for consolidation with the two suits pending in the Eastern District of Pennsylvania.[19] Moreover, to some extent, Rules 23.1 and 24, Fed.R. Civ.P., federalize the standard for derivative suit standing and intervention.

We address the choice of law problem by first examining the application of federal law which we believe is dispositive.

### B. *Law Applied Under Rule 23.1*

Rule 23.1 contains two explicit standing requirements for instituting a derivative action. The plaintiff (1) must be a stockholder at the time of the suit, and (2) must have been a stockholder at the time of the wrong of which he complains. This rule is derived from former Equity Rule 27. In the era of the equitable remedial rights doctrine, both standing issues would have been determined by federal standards.[20] The almost simultaneous arrival on the scene in 1938 of the Federal Rules of Civil Procedure[21] and the *Erie* doctrine,[22] however, raised the question of whether the text of Rule 23.1 (then Rule 23(b)) or the law of the state of incorporation should govern in the event of conflict between the two. Judge Goodrich recognized, but did not resolve, the possible conflict in *Gallup v. Caldwell*, 120 F.2d 90 (3d Cir. 1941), because he found no difference between federal standing requirements and the applicable state law. In

*Gallup v. Caldwell* the only cause of action advanced by the plaintiff was one arising under state law. Without noting that Rule 23(b) left open the question of who is a "shareholder," the court held that New Jersey, the state of incorporation, permitted an unregistered shareholder to sue. However, where the law of New Jersey was unsettled on the question of whether or not the wrongs complained of must have occurred before the stock purchase but the text of Rule 23(b) clearly required contemporaneous ownership, the court held that no conflict existed and that Rule 23(b) should govern.[23] In a later case, *Kenrich Corp. v. Miller*, 377 F.2d 312 (3d Cir. 1967), also raising a state law claim, Judge Hastie assumed, without extensive discussion, that shareholder standing would be determined by the law of the state of incorporation. Thus, just as in *Gallup v. Caldwell*, there was no conflict between applicable state law and Rule 23.1.[24]

These cases, of course, arose before the enormous impact of federal regulation upon the securities markets shifted the relative importance of federal law and state law causes of action. No case in this court has been called to our attention in which we have had to consider whether or not a restrictive law of a state of incorporation on shareholder standing for derivative suit purposes—a record ownership requirement

---

**19.** *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). *Cf., Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 408 n.7 (2d Cir. 1975); *In re Air Crash Disaster at Boston, Mass., July 31, 1973*, 399 F.Supp. 1106, 1108 (D.Mass.1975); *In re Four Seasons Sec. Lit.*, 370 F.Supp. 219 (W.D.Okl.1974); *In re Plumbing Fixtures Lit.*, 342 F.Supp. 756 (Jud. Pan.Mult.Lit.1972) (per curiam); *Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp.*, 309 F.Supp. 1053 (E.D.Pa. 1969). All of these opinions assumed that the rule of *Van Dusen v. Barrack, supra*, determines the interpretation of *federal* law which the transferor district would apply. It is difficult to understand why this should be so since *Van Dusen v. Barrack* involved conflicting *state* wrongful death policies, while in theory, at least, federal law, in its area of competence, is assumed to be nationally uniform, whether or not it is in fact.

**20.** *E. g., Venner v. Great N. Ry. Co.*, 209 U.S. 24, 28 S.Ct. 328, 52 L.Ed. 666 (1908). *See* 3B J. Moore's Federal Practice ¶ 23.1.15[1], at 51–55 (2d ed. 1975).

**21.** In accordance with the Act of June 19, 1934, 48 Stat. 1064, the Federal Rules of Civil Procedure became effective on September 16, 1938.

**22.** *Erie R.R. Co. v. Tomkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**23.** 120 F.2d at 94–95.

**24.** 377 F.2d at 314. Delaware, the state of incorporation, had, by the time of this suit, changed its law to conform with the federal standard of Rule 23(b). Previously, Delaware had not required contemporaneous stock ownership. *See* Chief Judge (then Vice Chancellor) Seitz's opinion in *Rosenthal v. Burry Biscuit Co.*, 30 Del.Ch. 299, 60 A.2d 106 (1948).

for example—could defeat, in a federal court, the derivative assertion of a cause of action based on alleged violations of federal law.[25] The question, however, was presented to the Second Circuit in *Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1972) (en banc).[26] The plaintiffs in that case, whose stock had been registered in "street name" at the time of the transactions complained of, brought a derivative action alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which injured a California corporation. California, by statute, permits derivative suits only by registered shareholders. The court held that federal law controlled the standing issue and that the federal rule recognizing equitable stock interests was controlling.[27] Judge Moore reasoned that just as it would be intolerable to permit the vagaries of state law to define securities for the purpose of federal substantive legal requirements, it would be intolerable to permit the vagaries of state law to introduce a lack of uniformity into the federal law of remedies for violations of those legal requirements.[28]

Any doubt as to the propriety of the Second Circuit's approach in federalizing the law of standing to assert a federal law cause of action derivatively was removed by the decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., supra*, in which, for the first time, the Supreme Court considered standing issues in a dual federal-state law context. In that case a purchaser acquired approximately 99% of a corporation's stock, and then caused the corporation to assert against those from whom the stock was purchased both federal and state law causes of action for prior mismanagement. The Court analyzed the two sources of law separately. On the federal claim, which, as in this case, was based on § 10 of the Clayton Act, Justice Powell approved the district court's holding that although the corporation was the nominal plaintiff, the suit would be treated as if the controlling stockholder was the actual plaintiff. Then, as a matter of federal law, he borrowed from state derivative suit jurisprudence the *Home Fire* rule[29] that a purchaser who acquires his shares from one who participated in the wrongdoing cannot complain of prior acts of mismanagement. On the state law claim, he looked to the law of Maine, the place of incorporation, and found that state's law to be identical on the standing question. The four dissenters did not agree that the *Home Fire* rule applied,

---

**25.** A closely analogous question was presented in *McClure v. Borne Chem. Co.*, 292 F.2d 824 (3d Cir.), *cert. denied*, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), which held that despite *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed.2d 1528 (1949), a plaintiff in a derivative § 10(b)(5) suit did not have to comply with state security for costs statutes. *Accord, Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 788–89 (2d Cir. 1951).

**26.** On rehearing in banc the court adopted the panel opinion's analysis of the standing question. 453 F.2d at 737 (Smith, J.).

**27.** Judge Moore wrote in the panel opinion:
The starting point in our analysis must be that appellants' derivative right of action to vindicate a federally created corporate right is one which is conferred solely by federal law. The remedial incidents of this federally created right must, of necessity, also be controlled by federal law, because the policy of uniformity within the federal system at least with respect to the issue at bar is paramount to any interests to be served by conformity with the variousness of state rules. . . .

[M]ore significantly, we are concerned here with an important enforcement provision of a federal statute intended not only to expand the common law but to create new, far-reaching and uniform law of shareholder-management relations in congressionally designated areas of substantive corporation law, which must not under the Supremacy Clause of the Constitution be subordinated to or otherwise hindered by the interposition of state requirements and limitations inconsistent with overriding federal policy. 453 F.2d at 728–29.

**28.** *Id.* at 729–30. *Drachman v. Harvey, supra*, was cited with approval by Chief Judge Seitz in *Ash v. Cort*, 496 F.2d 416, 422 n.5 (3d Cir. 1974), *rev'd on other grounds*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

**29.** In *Home Fire Insurance Co. v. Barber*, 67 Neb. 644, 43 N.W. 1024 (1903), Dean (then Commissioner) Roscoe Pound reasoned that, in such circumstances, the alleged injury to the corporation had already been reflected in the price paid for the stock.

but expressed no disagreement with the assumption that a federal rule governed standing to assert a claim based on a violation of the Clayton Act. The approach taken by the Court in *Bangor Punta* conforms to that taken by the Second Circuit in *Drachman v. Harvey,* and by this court in the analogous situation presented in *McClure v. Borne Chemical Co.* We conclude that standing in a Rule 23.1 case to assert a derivative claim based on federal law is a federal law question, and that for the same reasons standing to object to the settlement of such a claim is a federal law question.[30]

 It is the general rule, as well as the generally preferred view, that a pledgee of stock, whether or not that stock has been registered in the pledgee's name on the books of the corporation, has the same right to protect his stockholder's equity as does a pledgor.[31] Certainly under pre-*Erie* federal equity practice, it was recognized that a pledgee of stock could pursue stockholder equitable remedies.[32] That the pledgee in the case *sub judice* is an indenture trustee with fiduciary obligations to numerous public bond holders reinforces our conviction that the only sound federal rule is that a pledgee of stock has standing both to assert a Rule 23.1 derivative claim and to object to a settlement of that claim. Any other rule would be at variance with the evident intention of Congress, in passing the Trust Indenture Act, 15 U.S.C. § 77aaa *et seq.,* to

increase the protection of investors who depend upon the security which an indenture trustee holds in their interest. Moreover, situations will arise, as in this case, where the pledgor is the principal alleged wrongdoer. In such situations the interests of the pledgor and of the pledgee substantially conflict. A rule that would condition the pledgee's derivative suit rights upon the willingness of the pledgor to assert them would tend to aggravate the potential for harm implicit in that conflict. In short, the only federal rule consistent with sound public policy is one which recognizes that the equitable interest of a pledgee of stock is sufficient to confer standing in a Rule 23.1 derivative action.

### C. *Other Sources of Law on Standing*

Since the settlement order disposed of the federal securities and antitrust claims as well as the state law claims in a single package without differentiating between them, what we have already said disposes of the standing issue. Thus, we have no need to inquire into whether or not Irving, which claims that the settlement adversely affected the value of its security, would have standing to intervene under Rule 24(a)(2) or (b)(2), even if it did not have Rule 23.1 standing. Nor need we explore whether or not the law of Delaware or that of some other jurisdiction would govern Irving's standing if only a state law claim were involved in the case.[33]

---

**30.** Cf. *Greenfield v. Village Industries, Inc.,* 483 F.2d 824, 829 (3d Cir. 1973).

**31.** 12A W. Fletcher, Cyclopedia of the Law of Private Corporations, § 5651 at 419–23 (1972 Rev.) (collecting authorities); 13 *id.* § 5976 at 413–15; § 5985 at 430–32 (1970 Rev.) (collecting authorities); 3B Moore's Federal Practice, *supra* note 20 ¶ 23.1.17 at 152 nn.6, 8 (collecting authorities).

**32.** *See, e. g., Arcola Sugar Mills Co. v. Burnham,* 67 F.2d 981, 982 (5th Cir.), *cert. denied,* 292 U.S. 630, 54 S.Ct. 640, 78 L.Ed. 1484 (1930); *Gorman-Wright Co. v. Wright,* 134 F. 363, 364 (4th Cir. 1904), *cert. denied,* 207 U.S. 587, 28 S.Ct. 255, 52 L.Ed. 353 (1907).

**33.** At oral argument it was suggested that Irving would not have derivative standing under

Delaware law. *See Harff v. Kerkorian,* 324 A.2d 215 (Del.Ch.1974), *rev'd on other grounds,* 347 A.2d 133 (Del.Sup.Ct.) (per curiam) (convertible subordinate debenture holders cannot sue derivatively). *But see Jones v. Taylor,* 348 A.2d 188 (Del.Ch.1975); *Saks v. Gamble,* 35 Del.Ch. 378, 118 A.2d 793 (1955), *aff'd sub nom., Gamble-Skogmo, Inc. v. Saks,* 35 Del.Ch. 503, 122 A.2d 120 (Del.Sup.Ct.1956); *Rosenthal v. Burry Biscuit Corp.,* 30 Del.Ch. at 309–13, 60 A.2d at 111–13 (equitable shareholders standing to sue derivatively). *Compare Harff v. Kerkorian, supra with Kusner v. First Pennsylvania Corp.,* 531 F.2d 1234, 1237 (3d Cir. 1976) (convertible debentures are securities within the meaning of both the Securities Act and the Securities Exchange Act, 15 U.S.C. §§ 77b(1), 78c(a)(10)).

## IV. THE JUDGEMENT BAR CONTENTION

■ Appellees, however, urge that even if Irving had standing to object to the fairness of the settlement, it was precluded from doing so because that issue had already been litigated in the reorganization court and had resulted in a final order approving the settlement. Irving was, of course, a claimant in the reorganization proceedings. The trustees of Penn Central had applied to the reorganization court for permission to subscribe to the settlement, and Irving had participated in the hearing which resulted in the order granting it. This ground for precluding Irving in the instant case was never presented to or considered by the district court. In any event, those parts of the record in the reorganization court to which we have been referred make it clear beyond peradventure that Judge Fullam explicitly refrained from ruling on the fairness of the settlement to anyone other than the estate of the debtor.[34] Appellees' res judicata contention is simply frivolous.

## V. THE MERITS OF THE SETTLEMENT

In this case we review a settlement agreed to by both the corporation on whose behalf suit was brought and a group of shareholders with a 7% equity interest over the objections of the equitable holder of a 22.5% equity interest. P&LE derives no net benefit from the settlement but is required to pay out $2,100,000, of which $472,500 is attributable to the interest of the objector, and to release a $12,800,000 unpaid loan claim against Penn Central. The $150,000 contribution of the solvent defendants does no more than assure that the equity of the 7% shareholders is not diluted. Irving's

22.5% interest as equitable shareholder, however, is diluted by the creation and distribution of the settlement fund. The fund is to be passed *on* (not passed through, except for $150,000) only to the 7% minority shareholders and their attorneys. This arrangement is, to say the least, unusual.

■ It is generally assumed that recoveries in derivative actions belong to the corporation on whose behalf the suit was brought. Justice White, for example, wrote in *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970):

> The corporation is a necessary party to the [derivative] action; without it the case cannot proceed. Although named a defendant, it is the real party in interest, the stockholder being at [most a] nominal plaintiff. The proceeds of the action belong to the corporation and it is bound by the result of the suit.

Early in this litigation the district court seemed to accept this fundamental premise of derivative shareholder actions when it refused to limit liability to a pass *through* to the 7% stockholders.[35] Yet the settlement does far more than the court first refused to permit. It allows the allegedly injured corporation to pass *on* a fund taken from its own assets, with the only outside contribution being an amount sufficient to prevent dilution of the 7% interest that alone benefits from the distribution. The appellees have not called to our attention a single authority suggesting that such a method of "settling" a derivative suit is appropriate.

■ Since the corporation is the intended beneficiary of the suit, fairness of the settlement must in the first instance, we suppose, be measured by the benefit or detriment to P&LE. The appellees suggest only two such benefits. The first is that by

---

**34.** In the Penn Central reorganization court, Judge Fullam stated:

> I am not going to consider in this proceeding the fairness to P&LE. It seems to me that if you are correct in that, your position will be vindicated in the P&LE litigation and, obviously, there is no need to give you two separate forums in which to raise the issue. Appellees' Br., Addenda, at 61–62.

Moreover, the petition to the reorganization court only sought approval of the settlement as in the best interest of Penn Central's estate. As to P&LE the estate was an adverse party. It is a bit difficult to see how the reorganization court could adjudicate fairness of a settlement to an adverse party.

**35.** *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitr. Lit.*, 387 F.Supp. at 906.

virtue of the settlement P&LE avoided a potential liability for alleged violations of § 10 of the Clayton Act. The contention is that § 10 of the Clayton Act would have supported a treble damage recovery by individual shareholders for injury to the corporation resulting from lack of competitive bidding. There are two answers to that argument: (1) the Clayton Act claims which were settled were derivative claims;[36] (2) the contention that the corporation would be liable to its stockholders for injury to itself is patently meritless.[37] The second purported benefit to P&LE is that its management would be freed from the aggravation, time and expense of continued participation as an involuntary litigant. That benefit, of course, applies in every derivative suit since shareholders may only maintain a derivative suit where the corporation's management refuses to sue in its own name.[38] The district court, however, made no finding that this benefit bore any relationship to the figure $2,400,000. Considering that the lawsuit was on the eve of trial after years of preparation, we doubt that such a relationship exists.[39] The district court also listed as a benefit the fact

that P&LE "will receive an assurance from Penn Central that past tax allocation payments will not be recomputed."[40] The appellees, nonetheless, do not rely on this finding. Moreover, the Penn Central trustees have never suggested any other arrangement, especially since the chief reason for Order No. 497 in the reorganization proceeding appears to have been preservation of the existing tax allocation.[41] So much for the purported benefits accruing to P&LE. The detriment to P&LE's interests seems clear enough.

Turning next to the fairness of the settlement to other interested parties, we observe at the outset that Delaware, the state of incorporation of P&LE, does not permit pass through settlements of derivative lawsuits.[42] But when the suit is based on federal law, there may be room for a direct recovery by only the minority shareholders when a majority shareholder injures a corporation.[43] But we need not explore the possibility now, for in this case it is not the alleged wrongdoer alone who is denied benefit by the settlement. The pledgee's equity is being diluted to the extent of approximately $472,500. Certainly Irving was not

---

**36.** The district court dismissed the class action Clayton Act claims while permitting the derivative antitrust claims to proceed. *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitr. Lit.*, 378 F.Supp. at 444. The original plaintiffs did not attempt to appeal that order. Even though this interlocutory order was still present in the case, the district court's disposition appears so clearly sound that the possibility of appeal on that issue would not justify any payment in settlement. In any event, the district court did not predicate its approval of the settlement upon the minority shareholders' waiver of an appeal of the class action dismissal.

**37.** Even assuming a private antitrust remedy, it is inconceivable that the victim of a § 10 Clayton Act violation would have to pay damages. The same reasoning applies to the dismissed class action claims as to the derivative antitrust claims.

**38.** Rule 23.1, Fed.R.Civ.P.

**39.** At oral argument counsel for P&LE asserted that during more than three years of pretrial proceedings, the corporation had incurred litigation costs of "almost $400,000". Tr. at 60. However protracted a trial might have been, it

strains credulity to suggest it would cost P&LE $2,000,000 or more to protect its interests.

**40.** Finding 35, App. at 78a.

**41.** The district court also found further benefit to P&LE insofar as its "minority shareholders will receive releases from all defendants on their claims of indemnity . . .." Finding No. 38, App. at 78a. This *would not appear* to be a benefit to P&LE.

**42.** *Wilderman v. Wilderman*, 328 A.2d 456 (Del.Ch.1974); *Keenan v. Eshleman*, 23 Del.Ch. 234, 2 A.2d 904 (Del.Sup.Ct.1938), *aff'g* 22 Del.Ch. 82, 194 A. 40 (1937).

**43.** *See Perlman v. Feldmann*, 219 F.2d 173 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). The *Perlman* case has been said to involve only injury to the minority shareholders, not to the corporation. *Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir. 1969), *cert. denied*, 397 U.S. 989, 25 L.Ed.2d 396 (1970). *See also Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 188 (2d Cir. 1975), *cert. granted*, 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).

a wrongdoer. Its distinctive interests are as worthy of consideration and protection as are those of the 7% shareholders. The settlement gives Irving no benefit whatsoever, but does inflict a substantial detriment.

We have often said that in reviewing a court-approved settlement we utilize an abuse of discretion standard.[44] In this case, for a minimal if not non-existent benefit to P&LE, the settlement costs that corporation $2,100,000. The actual benefits flow only to plaintiffs' attorneys and the 7% minority stockholders. The form of the settlement assumes that only Penn Central, the chief beneficiary of the alleged wrongdoing, is interested in the other 93%. It ignores the patent reality that as to the 22.5% of P&LE stock, Penn Central's interest is, in an equitable sense, slight or nonexistent. It ignores the conflict of interest between Penn Central as pledgor and alleged wrongdoer and Irving as innocent pledgee. We have no hesitation in holding that the district court's approval of this settlement was an abuse of discretion.

The order approving the settlement will be vacated.

GARTH, Circuit Judge (dissenting):

While I agree with Parts III and IV of the majority opinion, which conclude that the Irving Trust Company has standing in this case and that it is not barred from asserting its objections by *res judicata* considerations, I cannot agree that the district court's action in approving the settlement on the merits constituted an abuse of discretion.

The majority, citing our opinion in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), correctly notes that the abuse-of-discretion standard governs review of court-approved settlements. (Majority Op. at 1070). "We will reverse the district court's approval of a class settlement only for a clear abuse of discretion." *Girsh, supra*, at 156 n.7 (cita-

tions omitted.) More recently, this Court in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir., 1976) (in banc), quoted the Ninth Circuit's formulation: "discretion is abused only where no reasonable man would take the view adopted by the trial court." *Id.* at 115, *quoting Delno v. Market St. Ry.*, 124 F.2d 965, 967 (9th Cir. 1942). We concluded:

Stated negatively, the appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision. Similarly, the appellate court may not reverse where the trial court employs correct standards and procedures, and makes findings of fact not clearly erroneous. In sum, "[i]f the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will defer to its exercise of discretion." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756 (3d Cir.) (in banc), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). But if the trial court has not properly identified and applied the criteria, the court's determination will not be entitled to such deference.

*Lindy Bros., supra*, at 116. All of the factors which we have required to be considered by the district court in approving a settlement were considered by Judge Gorbey. As appellees point out,[1] his order reflects consideration of the complexity, expense and duration of the litigation, App. at 77, ¶ 32; the reaction of the class, App. at 106, 112; the stage of proceedings and amount of discovery completed, App. at 70, ¶¶ 11, 12; the risks of establishing liability, App. at 74–75, ¶ 30; the risks of establishing damages, App. at 75–76, ¶ 31; and the reasonableness of the settlement fund, App. at 74, ¶ 29, App. at 77, ¶¶ 33, 34, App. at 76, ¶ 31(d).

Given that Irving assumes a "heavy burden"[2] in urging that the settlement be overturned on this record, I am unable to

---

44. *E. g., Girsh v. Jepson*, 521 F.2d 153, 156 & n.7 (3d Cir. 1975).

1. Brief for Appellees at 18.

2. *Lindy Bros., supra*, at 116.

agree that it has sustained that burden. Indeed, on the record before us, approval of this settlement is clearly correct.

The district court's approval of the settlement recognized that "the proposed settlement is fair to [P&LE] and all of its shareholders and is a proper compromise of the claims presented in light of the uncertainties and risks of continued litigation." App. at 74. These imponderables attended both questions of liability, *id.* at 74–75, and questions of damages, *id.* at 75–77.

In particular, the district court considered the complexity and novelty of the issues presented; the prospective length of trial, which was estimated to require about one month in the Eastern District action; the fact that other trials would be required in California, Connecticut, Ohio, Florida, New Jersey and Virginia; the fact that appeals from adverse trial decisions would be brought to various Courts of Appeals and possibly to the Supreme Court; and the fact that additional collateral litigation could result from any or all of these actions. App. at 77.

The district court then went on to examine the terms of the settlement. It found that recovery could properly be limited to the 7 percent minority shareholders "[b]ecause Penn Central, the majority shareholder of P&LE, participated in and benefited from the challenged transactions." *Id.* at 76. This solution prevented Penn Central from "benefit[ing] twice from overreaching made actionable by securities or antitrust laws." *Id.* at 76. In short:

> The amount to be distributed to minority shareholders, after payment of plaintiffs' counsel's legal fees and costs, is approximately equivalent to seven percent of the loans made to Penn Central

and not repaid, plus interest, if some consideration is given to inflationary factors. The distribution of said amount will result in all shareholders of P&LE receiving an equal distribution of funds on a per share basis.

*Id.* at 77. The district court thus concluded that the interests of all parties were served by the settlement.

The majority disagrees. Its opinion apparently anticipates that Irving will participate pro rata in the proceeds of the settlement.[3] But payment to Irving for the shares which are held as its collateral would represent precisely the kind of double payment that the district court praised this settlement for avoiding. As Irving is a creditor of Penn Central—and, for purposes of this litigation, it stands in such a posture to the extent of Penn Central's bonded indebtedness to the bondholders represented by Irving—it has *already* benefited by Penn Central's alleged self-dealing. Irving's primary interest, after all, lies in receiving continued payments of bond interest by Penn Central, and the receipt of an alleged 30 million dollars for which value had not been given by Penn Central could only have had the effect of increasing that company's ability to make payments on those bonds.

The district court was careful to note (and incorporate into its findings) the provisions of an agreement entered into by Irving and the Penn Central trustees pursuant to the order of the Reorganization Court. This agreement provides that Irving's bondholders are to receive interest payments from an escrow account established from dividends on Irving's pledged shares.[4] The district court observed that the settlement would have no effect on this agreement, as P&LE's ability to pay dividends would not be altered.

---

3. *See* Majority Op. at 1068–1070.

4. The district court summarized the agreement as follows:

 (a) Dividends on the pledged shares are paid into an escrow account and used to the extent necessary to make interest payments due on the bonds under the Collateral Trust Indentures;

 (b) If adequate provision is made for the interest payments so that they are no more than six months in arrears, any excess sums available from the dividends or accumulations thereon are payable to the Trustees; and

 (c) The Trustees have the right to exercise the voting rights with respect to the pledged shares.

 App. at 79.

Finally, the district court concluded that the settlement would not "materially affect the value of P&LE's stock pledged to Irving Trust Company." App. at 79.

On the state of this record it is obvious that these findings of the district court may not be disturbed by us, as they are not clearly erroneous. *See Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972).

No one contests the provisions or applicability of the Reorganization Court's order which assures dividend payments to Irving; furthermore, the record is completely silent as to what effect, if any, a payment of $2,100,000 by P&LE would have upon the stock held as collateral by Irving. It was Irving's burden to establish (if it could) any dilution or diminution in the value of its collateral. It did not do so although it had opportunity to produce evidence. The majority opinion asserts that Irving's equity "is being diluted to the extent of approximately $472,500," Majority Op. at 1069, and concludes that this inflicts a substantial detriment upon Irving with no benefit. Obviously, the figure of $472,500 is derived by multiplying P&LE's proposed settlement contribution of $2,100,000 by 22.5%, which is the percentage of the P&LE stock pledged by Penn Central with Irving. However, as I have indicated, Irving is not a shareholder and hence is not entitled to participate as a shareholder in the settlement proceeding. P&LE correctly points out that Irving, while claiming that the P&LE contribution to the settlement dilutes the value of its pledged shares, has offered no evidence to support this assertion, nor has it shown whether the P&LE contribution is to be derived from capital or surplus. P&LE's brief continues:

> Assuming that [the contribution] was from surplus, which at the end of 1974 was $119,772,369, Irving cannot be heard to complain since all of that amount may

have lawfully been distributed as dividends. If it had been so distributed, under terms of its agreement with the Penn Central Trustees Irving would have been entitled to receive only so much thereof payable on the pledged shares as was needed to pay bond interest; the remainder would have gone to the Penn Central Trustees.

> According to P&LE's 1974 Annual Report, there are 708,638 shares of its stock outstanding. Of these, 161,698 are pledged to Irving to secure the bonds. The 1974 Annual Report shows total shareholders' equity to be $160,603,310, or $225.79 per share. Thus, the pledged shares held by Irving have a book value of $36,509,931 to secure bonds outstanding as of the date of the agreement with the Penn Central Trustees in the principal amount of $14,821,700. If the contribution by P&LE of the sum of $2,100,000 to the settlement fund is deducted from the shareholders' equity, the book value of the shares pledged to Irving is reduced only by approximately $472,000. The book value of the P&LE stock held by Irving would still be over $36,000,000 to secure $14,800,000 worth of bonds. Under the circumstances it is difficult to see how the value of the collateral would be seriously diluted by the settlement. (Footnote omitted.)

Brief for Appellees at 14–15.

In the absence of any evidence showing "dilution" or "effect", the district court was clearly correct in its finding that the settlement would not materially affect the value of P&LE stock pledged to Irving Trust Company.

Even had there been such proof of dilution, however, the mere showing of an adverse effect cannot of itself suffice to void a settlement.[5] If this were so, the mere

---

5. In *Bryan v. Pittsburgh Plate Glass, Inc.*, 494 F.2d 799 (3d Cir. 1974), this Court held that
 While the proportion of the class opposed to a settlement is one factor to be considered in assessing its fairness, see C. Wright & A. Miller, Federal Practice and Procedure Civil § 1797 and cases cited n.42 (1972), a settle-

ment is not unfair or unreasonable simply because a large number of class members oppose it. The drafters of Rule 23 chose as a means of protecting the class the requirement that the district court approve the settlement. They did not require rejection of a

grant of standing to object to a settlement would be tantamount to the rejection of any compromise. Hence, an allegation of an adverse effect may be sufficient to confer standing, but rejection of the settlement should follow only if the district court, upon completion of its inquiry, concludes that the settlement is inadequate or unfair. In short, "[t]he decision of whether to approve a proposed settlement . . . is left to the sound discretion of the district court." *Girsh v. Jepson, supra,* 521 F.2d at 156. Nothing in the majority opinion's discussion persuades me that the district court's approval of this settlement was an abuse of that discretion.

To the contrary. It appears to me that the majority has been guilty of the very process condemned by Judge Gibbons in his dissenting opinion in *Linmark Associates, Inc. v. Township of Willingboro,* 535 F.2d 786, 810 (3d Cir. 1976), where he stated, in referring to the majority decision in that case, that

> the majority, by a disingenuous process of selection and omission, sifts through the record below to construct its own findings to justify a predetermined result. . . . [Its] opinion completely inverts the respective roles of the trial and appellate courts, and is an instance of ad hoc decision making.

Judge Gibbons' comments in *Linmark Associates, Inc., supra,* addressed to the majority in that case, are just as relevant when applied to the majority opinion here. It is quite evident to me that P&LE is desperately anxious to terminate protracted and expensive litigation—litigation that not only has required expenditure of its time, energy and monies over a period of years,

but is destined to sap even more of its time, energy and monies in the years to come. A fair reading of P&LE's position—and of the district court's findings and conclusions, which required some 21 pages—indicates to me that the settlement focused on P&LE's efforts to halt this drain on its resources. The district court, having considered all aspects of future litigation expense, and having balanced this factor with the other settlement features, concluded that the settlement compromise was justified and fair.

The majority, however, totally ignores paragraph 32 [6] of the district court's order (which details the facts of continuing litigation and consequent expense), claiming that the district court has made no specific finding as to any relationship between the settlement sum and the benefits to P&LE to be achieved by freedom from continued participating as an involuntary litigant. However, we have never required the same quality or exactitude in findings supporting the approval of settlements as we have required when dealing with the final merits of a case. As we have previously held, the district court need only set forth the reasoning which supports its conclusion in sufficient detail to make meaningful review possible. *See Bryan v. Pittsburgh Plate Glass, Inc., supra.* In *Bryan,* a challenge was made to the district court's approval of a settlement. Chief Judge Seitz, in affirming the district court's approval of the settlement, said:

> Here the district court's opinion meets that requirement; it catalogues the parties' contentions, indicates the court's view of their strengths, and notes additionally the substantial delays likely in ascertaining appropriate back pay, should

---

settlement on objection of a given part of the class.
*Id.* at 803.

6. 32. In addition to the foregoing, continued litigation over the complex and novel issues presented herein will be protracted and expensive for all parties concerned. Trial is estimated to last approximately one month in the Eastern District action. Other trials will be set in California, Connecticut, Ohio, Florida, New Jersey and Virginia. Thereafter, appeals will lie to the respective circuit courts

[*sic*] involved and ultimately to the Supreme Court. In addition, the termination of this litigation, other than by settlement, would likely spawn additional litigation, to wit, litigation involving claims of indemnity by the defendants or some of them against P&LE and/or against Penn Central. A compromise of the claims as proposed herein will bring to an end, once and for all, further protracted and expensive litigation.
App. at 77.

plaintiffs win such relief. To require a fuller statement of the court's views would turn a decision on approval of a proposed settlement into a determination on the merits in all but name.

494 F.2d at 804. To require a detailed analysis of litigational costs totalling the amount of the P&LE contribution would in the first instance be impossible; second, it would virtually require a separate and independent trial to determine how much it would cost to defend each of the pending cases; third, it would discourage rather than encourage settlements; and fourth, it would turn a decision on the approval of a proposed settlement into a decision on the merits.

In addition to the savings of litigational expense, P&LE summarized the result of the settlement by suggesting that the court ask itself

who paid or gave up what, and to whom, and is this fair under the circumstances?

—Since Penn Central owns 93 percent of the stock of P&LE, of the $2,100,000 contributed by P&LE, 93 percent or $1,950,000 comes from Penn Central's share of P&LE's assets, and 7 percent or $150,000 comes from the minority's share of the assets.

—The minority recoups the $150,000 depletion of its share of the assets through the contribution of the other defendants in that amount.

—The Penn Central benefits from the extinguishment of $12,800,000 principal indebtedness and accrued interest and through other provisions of the settlement.

Brief for Appellees at 17.

What is at issue here is whether the district court, faced with the prospect of requiring P&LE to remain as an involuntary litigant, took into account the various factors specified by us in *Girsh v. Jepson, supra*, made findings of fact based upon record evidence and then in its discretion concluded that the settlement constituted a proper compromise in light of the uncertainties and risks of continued litigation.

I am satisfied that Judge Gorbey employed the correct standards and procedures in his approval of the settlement, and that his findings of fact are not clearly erroneous. In so doing, he properly exercised his discretion and his decision approving the settlement should not be overturned because the majority of this panel has a visceral disagreement with his decision and with the settlement itself. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., supra*, at 116 (set out at p. 1070 of this opinion.)

I believe that the majority has ignored the district court's findings and has substituted its own version of the facts. *See Linmark Associates, Inc., supra* (Gibbons, J., dissenting). It is for that reason that I cannot join in the majority opinion. I therefore dissent from the holding of the majority opinion, and I would affirm the district court's order approving the settlement.